**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 96-20483

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MOHAMMED SULTAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

June 10, 1997

Before  DUHÉ, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Mohammed Sultan ("Sultan") appeals his conviction on counterfeit trafficking charges under the Trademark Counterfeiting Act of 1984, codified at 18 U.S.C. § 2320 ("§ 2320"). His main argument is that the evidence was insufficient to sustain his conviction. In addition, he asserts that the district court erred in computing his sentence, failing to suppress statements he made while in "constructive" custody, and failing to exclude expert witnesses from the courtroom during live testimony. For the following reasons, we reverse Sultan's conviction, vacate his sentence, and order his immediate release from custody.

**BACKGROUND**

Sultan owned an auto parts surplus warehouse in Houston, Texas. He started the business in 1988, and named it Multiple Auto Parts Industries ("MAPI"). Sultan was an authorized General Motors ("GM") warehouse distributor ("WD") who bought parts from GM and other suppliers, then

resold those parts overseas to Saudi Arabian customers. Sultan moved into a warehouse at 6546A Petropark ("Petropark") in early 1992. Sultan shared warehouse space with Garbis Jerjerian ("Jerjerian"), another auto parts dealer, at the Petropark location.[1] Jerjerian operated Sarine Corporation ("Sarine") from that same warehouse. The businesses were kept separate and merely run out of the same building, although Sultan bought a large amount of merchandise from Jerjerian.

In April 1993, Sultan moved out of the Petropark warehouse into another warehouse on Highway Six ("Highway Six") in Houston. In late April of 1994, Sultan was notified that an alarm had gone off at the Petropark warehouse. Although he no longer occupied that space, he was still listed as a person to contact in the event the system went off. When Sultan arrived at Jerjerian's Petropark warehouse, he found customs Agents in the process of executing a warrant. The agents discovered approximately one million dollars worth of counterfeit auto parts and thousands of documents evidencing counterfeiting activity in the warehouse. They also found a back room in the warehouse where evidence of counterfeiting activity was present. The evidence showed that counterfeit GM markings were being applied to auto parts, and then placed in counterfeit GM boxes. Sultan was not permitted to enter the warehouse, but he willingly spoke with agents at the scene and answered their questions. Sultan claims that at one point, he thought the agents had finished asking him questions, but that he was stopped and told to exit his car when he tried to leave. He was never read his Miranda rights.

In May 1994, suspecting that Sultan was counterfeiting auto parts, GM conducted an audit of MAPI. The contract between all WDs and GM entitled GM to conduct an audit of the WD's business at any time. The GM investigators confiscated several parts and boxes to examine whether they were counterfeit or not. None of Sultan's parts, however, were counterfeit. In September 1994, Customs Agents executed a search warrant at Sultan's warehouse on Highway Six. Sultan called his attorney, but his attorney was unable to be present at the search. The attorney told Sultan not to

---

[1]The two previously shared warehouse space at 10795 Hammerly Blvd. in Houston.  We refer to this warehouse as "Hammerly."

answer any questions, and told the agents not to ask his client any questions. The agents questioned Sultan anyway, and he answered those questions. Consistent with the GM audit, the agents did not find any counterfeit auto parts in Sultan's warehouse.

In the meantime, evidence was uncovered that Jerjerian obtained remanufactured auto parts[2] from several companies, including Eveready Carburetor, AES and FASA, and would then alter the parts by changing the serial numbers, repainting them or relabeling them to look like new GM parts. He would then repackage them in counterfeit GM packaging and boxes[3] and resell the parts as genuine GM parts.

Sultan and Jerjerian were indicted for violating 18 U.S.C. § 2320(a), which prohibits trafficking in counterfeit goods. Jerjerian fled the country before trial and was never tried. Sultan was charged with six counts of trafficking in counterfeit goods for several shipments of auto parts he made to Saudi Arabia between April 1993 and April 1994, and one count of aiding and abetting Jerjerian with marketing counterfeit goods. Sultan was convicted on all counts. Sultan was sentenced to 30 months' imprisonment per count, with the sentences to run concurrently. He was also ordered to pay restitution, a special assessment, and the costs of his imprisonment and supervised release. Sultan appeals from that judgment.

## STANDARD OF REVIEW

We review a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We affirm if a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Id.* "If a reasonable jury would doubt whether the evidence proves an essential element, [this court] must reverse." *U.S. v. Onick*, 889 F.2d 1425, 1428 (5th Cir. 1989). All credibility determinations and *reasonable* inferences are to be resolved in favor of the jury's verdict. *U.S. v. Nguyen*, 28 F.3d 477,

---

[2]The parts found and relevant to this case are starters, alternators and brakes.

[3]The packaging was evidently a very good replica of genuine GM packaging because even the GM auditors and customs agents had a hard time figuring out which ones were real and which were fake.

480 (5th Cir. 1994). Thus, we do not concern ourselves with the correctness of the jury verdict; rather, we must determine whether the finding of guilt is reasonable under all the circumstances. *Jackson*, 443 U.S. at 318-319.

## DISCUSSION

The government bases its case on an inferential chain of events, from the purchase of remanufactured and new non-GM auto parts to the alleged sale of counterfeit GM auto parts to customers in Saudi Arabia. It is undisputed that Sultan was in the business of selling auto parts and that he was engaging in such activities at all times relevant to this appeal. Sultan argues, however, that the government has not proven that the parts he sold were counterfeit or that, if they were, he knew they were counterfeit. We need not address Sultan's first contention because we conclude that, after a thorough review of the record, the government failed to prove beyond a reasonable doubt that Sultan knew he was purchasing and selling counterfeit parts.

At the outset, we note that in a case such as this—based wholly on circumstantial evidence—we cannot indulge unreasonable inferences to bridge gaps in the government's case. Our review is limited to "whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence." *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995). "However, we must reverse a conviction if the evidence construed in favor of the verdict 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged.'" *Id.* (citing *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995)).

To prove a violation of 18 U.S.C. § 2320 (a), the government must establish that: (1) the defendant trafficked or attempted to traffic in goods or services; (2) such trafficking, or the attempt to traffic, was intentional; (3) the defendant used a counterfeit mark on or in connection with such goods or services; and (4) the defendant knew that the mark so used was counterfeit. The term "traffic" means to transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent so to transport, transfer or dispose of. 18 U.S.C. § 2320 (d)(2). A "counterfeit mark" is defined as a spurious mark used in connection with

4

trafficking that is identical or indistinguishable from a registered trademark and the use of which is likely to confuse, cause mistake, or deceive. 18 U.S.C. § 2320 (d)(1)(A)(I)(ii) and (iii).[4]

Section 2320(a) has two mental state requirements: "first, that the defendant 'intends' to traffic in goods or services, and second, that he or she 'knows' that the goods or services are counterfeit." *United States v. Baker*, 807 F.2d 427, 429 (5th Cir. 1986) (quoting S.Rep. No. 526, 98 Cong., 2d Sess. 11 (1984), reprinted in 1984 U.S.Code Cong. & Ad.news 3627, 3637). Because the fact of shipment is not in controversy we need only address Sultan's knowledge as it relates to the purchase and subsequent shipment of the parts purchased from Jerjerian.

The government's proof of Sultan's knowledge primarily rests on six points: (1) the jury could have reasonably concluded that Sultan's personality type would have put him on notice of the counterfeiting; (2) Sultan made inconsistent and untruthful statements; (3) Sultan was shown a counterfeit GM bag by Jerjerian; (4) Sultan shared warehouse space with Jerjerian when counterfeiting activity was taking place; thus, he must have seen signs of counterfeiting; (5) Sultan was an experienced WD, who was aware of industry practices regarding the acquisition and pricing of GM parts; and (6) as a WD, Sultan was familiar with GM practices regarding its packaging. We address each of these theories in turn.

1. *Sultan's Personality*

The government contends that Sultan's attention to detail and his penchant for thriftiness should have put him on notice that the parts he received, at the prices he paid, were counterfeit. Because of this personality trait, argues the government, the jury could have inferred Sultan knew about the counterfeiting. Kinghorn testified that during his audit of Sultan he witnessed Sultan's keen

---

[4]To convict a defendant as an aider and abetter, the government must show that the defendant's act contributed to the execution of the criminal activity and that he intended to aid in its commission. *United States v. Stovall*, 825 F.2d 817, 827 (5th Cir. 1987). Plainly, if we conclude that the government did not prove beyond a reasonable doubt that Sultan knew that he was purchasing and selling counterfeit parts, we must necessarily conclude that Sultan did not aid and abet Jerjerian in counterfeiting. Accordingly, our discussion of the knowledge requirement in § 2320 necessarily applies to Sultan's liability as an aider and abetter.

awareness of his entire inventory. Prior to retrieving a container of auto parts for inspection, Sultan would tell Kinghorn exactly what parts were contained inside, and each time he was correct. This occurred approximately 35 times. Also, Abrahim Safahieh, an international freight forwarder, testified that Sultan would shop around for the best shipping price for his customers, and he would often use a trucking company he knew rather than the one affiliated with the freight forwarder because the other company was cheaper. Finally, Grundy testified that Sultan was quick to contact him if GM made a shipping error. This testimony, as the government argues, reflected that Sultan closely checked his deliveries.

We find the government's arguments unpersuasive. A person running a one-man operation—such as Sultan—is more likely to know the full extent of his inventory, if for nothing else, to efficiently run his business because there are no employees to rely upon. Further, Safahieh also testified that Saudi Arabian customers liked to get the bottom line on costs—much like anyone else—so Sultan's price shopping was a normal business procedure. Moreover, this fact could equally, if not more than, prove that Sultan was trying to make a profit and keep customers as it could prove Sultan's knowledge that he was buying and selling counterfeit parts. Finally, it could hardly be said that a sole proprietor's recognition of shipping errors correlates with knowing parts are counterfeit. Sultan would obviously know what parts he ordered and the quantity of each part, thus, all it would take to discover an error would be to match the quantity of parts or type of parts received with the purchase order. This procedure is not as novel as the government would have one believe. All told, these tendencies are, of course, circumstantial evidence, but together they are not sufficient to impute knowledge to Sultan beyond a reasonable doubt. Accordingly, we find these arguments insufficient to establish knowledge.


2. *Sultan's inconsistent statements*

The government contends that Sultan made a number of untruthful statements to investigators, and, based on these statements, the jury could have reasonably concluded he lied because he had guilty knowledge. Specifically, the government argues that Sultan lied about the amount of parts he was purchasing from Jerjerian and his ability to operate his computer. We cannot conclude that this evidence shows beyond a reasonable doubt that Sultan knew about the counterfeiting.

Agent Sult testified that Sultan arrived at Petropark on the night of the April 1994 search and he then later made the statement that he purchased small quantities of shocks and other parts from Jerjerian. On cross-examination, however, he admitted that at the time Sultan made that statement he was neither the focus of the investigation, nor was he tied to Jerjerian for the purpose of the search. Therefore, any inconsistent statement made by Sultan was not necessarily due to the pressure of being under investigation as the government implies. To conclude as the government does, we would have to assume that Sultan knew that he would later come under investigation and that he knew the government would not find out the extent of his purchases from Jerjerian.[5] The government offered no evidence that would permit a reasonable jury to draw these two inferences.

The government's argument that Sultan's statement about his inability to operate his computer is similarly without merit. Although Rick Grundy testified that he saw Sultan operating his computer at Sultan's Highway Six warehouse, that still does not, by itself, impute knowledge to Sultan. Without evidence establishing that what Grundy saw was Sultan working on something relevant to his auto parts inventory, we simply cannot make the leap that this inconsistent statement points to guilt.[6] In order to agree with the government's argument, we would have to assume that what

[5]Several non-criminal reasons could account for Sultan's statement. Also, when viewed against the backdrop of his overall sales, Sultan may have meant that as compared to his other sales, his purchases from Jerjerian were small. The evidence adduced at trial showed that Sultan was doing a multimillion dollar a year business with GM, and he was steadily increasing his sales each year. The invoices from Petropark that are tied to Sultan do not come close to equaling Sultan's GM sales. Thus, interpreted a different way, Sultan's statement could actually be an accurate depiction of his business with Jerjerian.

[6]Though not dispositive, the defense also pointed out at oral argument that none of Sultan's documents found at Petropark, nor any documents found at his Highway Six warehouse, were computer generated. Thus, it is plausible to infer that Sultan didn't use his computer for all, or any, of his business needs.

Grundy saw was pertinent to Sultan's purchases with Jerjerian, then infer that based on Sultan's statement to investigators, Sultan was hiding his guilt. Again, the government did not offer any evidence that would permit a reasonable jury to make any of these inferences.

3. *The counterfeit bag incident.*

Ginger Gaman testified that on one occasion she accompanied Jerjerian to Sultan's Highway Six warehouse. She had earlier given Jerjerian a counterfeit GM bag, and he was going to show Sultan the bag. When they arrived at the warehouse, Gaman was close enough to hear Jerjerian and Sultan talking; however, because they were talking in Arabic, she could not understand what they were saying. When Jerjerian returned to the car, he said, "he could not tell the difference." The government contends that this could reasonably be interpreted to mean that Sultan was being shown the quality of Gaman's work to get his approval.

This incident, standing alone, cannot sufficiently establish Sultan's knowledge in order to sustain a conviction beyond a reasonable doubt. This incident could have easily been interpreted, as the defense suggests, as Jerjerian going to Sultan to see if he could fool him with the counterfeit bag to ensure that he would not suspect he was not receiving genuine GM parts. With these diverging interpretations, we simply cannot say that this incident alone establishes knowledge beyond a reasonable doubt.

4. *The sharing of warehouse space*

The government claims that Sultan's knowledge may be inferred because Sultan and Jerjerian shared warehouse space and he should have seen signs of counterfeiting. The parties dispute whether Jerjerian was counterfeiting while he and Sultan shared warehouse space.[7] Roger Stephen, FASA's managing director, testified that he sold unassembled brake sets to Jerjerian from 1992-94 and

---

[7]The government argues that invoices and shipping documents dated in April 1993, which state Sultan's address as Petropark, were evidence that he was still there when counterfeiting is known to have taken place. This argument fails because the government's own Exhibit # 63 shows several invoices from Sultan to Jerjerian showing the Hammerly warehouse address as Sultan's and dated after Sultan was known to be at Highway Six.

delivered the shipment to the Petropark warehouse. Ginger Gamen, outside sales representative for Industrial, testified that she started calling on Jerjerian in August 1992, and remembered seeing the counterfeit room. She also remembered seeing Sultan when she visited, but then she stopped seeing him after a while.

On cross-examination, however, Stephen stated that several of Jerjerian's orders were delivered to third parties, who most likely assembled the brakes for Jerjerian. Thus, the likelihood of Sultan noticing anything suspicious was less apparent. Both AES and Eveready representatives testified that they started shipping parts around the same time (April 1993) that Sultan moved to Highway Six, so it is likely he never saw these other shipments. On direct-examination, Gaman was asked whether she recalled when she became aware of the counterfeit room and she responded, "not specifically." Further, Gaman testified on cross-examination that she never saw Sultan in the counterfeit room.

Finally, Benjamin Uzick, a real estate broker, testified that he had shown Sultan various properties and was instrumental in helping Sultan purchase the Highway Six warehouse. Prior to that time, he remembered going to the Petropark warehouse and observing Jerjerian and Sultan stocking the warehouse of their inventory. He noticed that Sultan would only unload to one side and Jerjerian would only unload to the other. This testimony would support Sultan's contention that, although he was housed in the same warehouse, his inventory was segregated from Jerjerian's.

Without any additional evidence implicating Sultan based on his co-tenancy with Jerjerian, all the government has is a mere presence case.[8] We have held that mere presence in a climate of criminal activity or association with participants in criminal activity, without more, cannot serve as the basis for a conviction. *See, e.g.*, *United States v. Ross*, 58 F.3d 154, 160 (5th Cir. 1995)

---

[8]The government also tries to implicate Sultan by arguing that during a April 27, 1993 investigation of Jerjerian, Customs agents went to Petropark and saw Jerjerian's and Sultan's cars and saw Jerjerian himself and another person they imply was Sultan. Both agents, however, could not positively identify Sultan as the other man they saw on that day; they could only confirm that they saw Sultan's and Jerjerian's car. Regardless, the agents only observed the men outside or near the entrance of the warehouse; thus, there was no way for them to determine whether Sultan was still housed there or not.

(reversing a defendant's conviction for drug conspiracy when the defendant was observed making change with another drug dealer selling at same location); *compare United States v. Ismoila*, 100 F.3d 380 (5th Cir. 1996) (affirming a defendant's conviction for wire fraud and money laundering when evidence established that defendant was more than just "merely present" during criminal activity).

We have previously considered an argument concerning whether a person's presence during criminal activity was enough to convict under § 2320. In *United States v. Yamin*, 868 F.2d 130 (5th Cir. 1989), the defendant, Yamin, asserted that the evidence presented against him merely showed that he associated with persons engaged in criminal activity. The evidence adduced, however, painted a different picture. Defendant was a co-owner of a jewelry store which was suspected of selling counterfeit watches. A witness testified that on three separate occasions she purchased watches from Yamin's co-defendant at Yamin's apartment. There was also evidence that Yamin sold counterfeit watches, and that he was present when his co-defendant was negotiating the sale of counterfeit watches under circumstances from which Yamin's knowledge could be inferred. Thus, we held that the evidence was sufficient for the jury to find beyond a reasonable doubt Yamin's active participation in the conspiracy. *Id*. at 135.

Unlike *Yamin*, the facts adduced in the instant case do not directly implicate Sultan, nor has the government presented sufficient circumstantial evidence to infer that Sultan knowingly participated in or acquiesced in Jerjerian's activity. We therefore hold that the sharing of warehouse space evidence was insufficient to prove Sultan's knowledge of the counterfeiting activity.

5. *Sultan's familiarity with GM pricing*

The government relies on Sultan's experience as a WD to argue that it was reasonable for the jury to infer that he had to know that the low prices he was paying Jerjerian for the large quantities of parts he was buying could not have been for genuine GM parts. Rodney Kinghorn, senior administrator of investigations for GM, testified that it would be impossible for anyone to consistently get genuine GM parts—at least alternators, starters, and brakes—below the WD price in the

quantities Sultan was purchasing from Jerjerian. Rick Grundy, GM account sales manager, testified that he supplied Sultan with bulletins containing WD pricing information; thus, Sultan was apprised of the price he would have to pay as a WD.

On cross-examination, however, Kinghorn acknowledged that there are several ways the WD price can be undercut. He mentioned a bulk sales program,[9] bankruptcy sales, dealerships going out of business, foreign sources, and discounts for WDs. He did not feel, though, that any of these sources could consistently provide the parts Sultan was buying and in the quantity that Sultan was purchasing from Jerjerian. Nevertheless, he had to concede that WDs do not corner the market on GM parts as far as the price or quantity is concerned. David Fleishman, owner of a surplus business called World Trading, testified that he knew of at least four ways to purchase various manufacturers' genuine parts for, in some cases, five to ten cents on the dollar. He mentioned purchasing through excess, obsolescence, change-overs, or packaging changes. Although he never purchased GM parts through these means, he acknowledged that GM parts could be purchased this way.

The government also argues that the prices were so far below the WD price that Sultan had to know that he was purchasing counterfeit parts. Government Exhibits 82-93, reflect the differences in price between the parts purchased from Jerjerian and the WD price for the same part. However, as Sultan points out in his brief, the prices he paid Jejerian were usually 80-90% of the WD price, and only twice did the difference fall below 70% of the WD price. In actuality, it was Jerjerian who was gaining the most from the sales to Sultan, as reflected in the exhibits. Further, Kinghorn testified that there was nothing wrong with a WD buying GM parts from other suppliers and paying below the WD price. It would appear then, that the government's argument is based solely upon Sultan making a profit from his transactions with Jerjerian.

Thus, in order to piece together this aspect of the government's case, we must first assume (1) that Sultan was not aware of other sources of genuine GM parts, or (2) that there was no way

___

[9]Kinghorn stated that alternators, starters, and brakes—the parts relevant to this case—are not sold in the bulk sales program, but he did concede that sub-components to these parts are sold in the program. He further conceded that these sub-components could be assembled to produce the actual part.

11

Jerjerian could buy from these sources, or (3) that these sources in the aggregate could not supply Jerjerian with the quantity of parts needed to sell to Sultan. Next, assuming those sources were not available, on the basis of the prices he paid, we still must infer that Sultan knew he was purchasing counterfeit parts. Accepting this argument requires nothing less than stacking assumption upon inference and inference upon mere inference—wholly insufficient evidence to sustain a conviction beyond a reasonable doubt.

6. *Sultan's familiarity with GM packaging*

The government next contends that Sultan's knowledge as a WD should have caused him to be aware that Jerjerian was not legally in possession of "GM" packaging. In addition, Kinghorn testified that GM stopped selling its packaging separately in 1984, thus, there was no way for a person to get genuine GM packaging without the parts. Further, he said that if he was a WD he would be "outraged" and would notify the authorities if he saw GM packaging in a warehouse he shared with a non-GM dealer. Donald Webb, owner of Webb packaging, testified that his company delivered large quantities of "GM" packaging to the Petropark warehouse and he would see the packaging himself when he visited. Similarly, Gaman, testified that when she would call on Jerjerian at the Petropark warehouse she would see numerous different size boxes "that [were] just auto parts."

The government's argument, however, requires a myriad of inferences to get to the conclusion that Sultan possessed knowledge. There was no evidence establishing that Sultan was aware that the stored packaging was "GM" packaging, much less counterfeit packaging. Webb himself admitted that of all the times he went to the Petropark warehouse he never once saw Sultan. Even more compelling is that Webb stated that certain type boxes he shipped to Jerjerian were packaged in "a plain brown box." Further, he never conclusively stated that a person would know specifically what was contained in the shipment by just looking at it. Gaman stated that she saw Sultan, but she remembers seeing him in "a little room off of the front office." Thus, it is entirely possible that Sultan did not know that the packaging in the warehouse was for counterfeit GM products. This conclusion, is even more

12

plausible when we consider the earlier testimony of Uzick concerning the segregated nature of Jerjerian's and Sultan's inventory within the Petropark warehouse. Accordingly, we cannot say that this evidence establishes Sultan's knowledge beyond a reasonable doubt.

In sum, we hold that the evidence presented by the government on the issue of knowledge falls short of the requisite evidence from which a conviction could be sustained beyond a reasonable doubt. The government's case against Sultan, however, goes beyond making reasonable inferences and requires making unreasonable leaps to bridge the gaps in the evidence. Thus, we conclude that the government has failed to sufficiently prove that Sultan knew he purchased and sold counterfeit GM parts—the fourth element under § 2320.

## CONCLUSION

After reviewing the record and all of the evidence in the light most favorable to the verdict; we find insufficient evidence to support the jury's finding that the government proved beyond a reasonable doubt that Sultan knew he was purchasing and selling counterfeit parts. Accordingly, we REVERSE the conviction, VACATE the sentence, and ORDER Sultan's immediate release from custody.