# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DONALD RALPH GILES,
also known as Sonny Giles,

    Defendant-Appellant,

No. 99-6036

---

**ORDER ON REHEARING**
Filed June 26, 2000

---

Before **SEYMOUR**, Chief Judge, **BALDOCK** and **BRORBY**, Circuit Judges.

---

The government has filed a petition for rehearing asking us to clarify footnote 6 in the opinion to make it clear that the government did not argue an aiding and abetting theory. We grant the petition. A revised opinion is attached.

Entered for the Court

PATRICK FISHER, Clerk of Court

by:

    Keith Nelson
    Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 19 2000**

**PATRICK FISHER**
Clerk

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DONALD RALPH GILES,
also known as Sonny Giles,

      Defendant-Appellant,

No. 99-6036

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 98-CR-82-C)

---

Victoria D. Little, Decatur, Georgia, appearing for the Defendant-Appellant.

Susan Dickerson Cox, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, appearing for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **BALDOCK** and **BRORBY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

In a case of first impression in this circuit, we are asked to determine whether an individual who traffics in trademarks which are not attached to any goods or services violates the federal criminal trademark infringement statute, 18 U.S.C. § 2320. We conclude that he does not. Consequently we reverse Donald Ralph Giles' conviction for trafficking in counterfeit goods in an alleged violation of section 2320.

**I**

Mr. Giles owns a business in Atlanta, Georgia, called "Fabulous Fakes," which specializes in the sale of "designer look-alikes" such as handbags, belts, watches, and accessories in designer styles. Mr. Giles also occasionally sells certain items in bulk on the wholesale market. The items at issue in this case are wholesale "patch sets" bearing the logo of Dooney & Bourke, makers of high quality handbags, luggage, and accessories. A "patch set" consists of a leather patch and a gold medallion, which both bear the Dooney & Bourke logo, and a leather strap which is used to attach the medallion to a purse or piece of luggage. The leather patch can either be sewn or glued on. Once the patch set is applied to a generic purse or piece of luggage, the bag will appear to have been made by Dooney & Bourke.

-2-

In June 1994, the FBI set up a "sting" operation with the help of confidential informant Michael Davenport, a major distributor of counterfeit merchandise in Oklahoma. FBI officials offered Mr. Davenport leniency in an upcoming prosecution if he would assist them in an investigation of other dealers in counterfeit merchandise. Under FBI surveillance, Mr. Davenport contacted various suppliers and customers in an attempt to set up a deal. One supplier gave him Mr. Giles ' name and phone number. Mr. Davenport then called Fabulous Fakes and spoke to a store employee, Delores Notaro, about purchasing 1,000 Dooney & Bourke patch sets.

Mr. Davenport spoke with Ms. Notaro again in July about the price and shipment of the patch sets. The patch sets were then shipped to Oklahoma where they were seized by the FBI. Mr. Giles was subsequently indicted on one count of trafficking in counterfeit goods in violation of 18 U.S.C. § 2320. Mr. Giles made timely motions to dismiss the indictment and to acquit, which were denied by the district court. He was convicted by a jury and sentenced to sixteen months in prison, a $3,000 fine, and two years of supervised release. He appeals the district court's denial of his motions.

## II

Generally, we review the grant or denial of a motion to dismiss an indictment for an abuse of discretion. *See United States v. Wood*, 6 F.3d 692, 694 (10th Cir. 1993). However, when the dismissal involves issues of statutory interpretation, or when the sufficiency of a charge is challenged, we review the district court's decision de novo. *See id.*; *United States v. Wood*, 958 F.2d 963, 974 (10th Cir. 1992).

Mr. Giles contends that the indictment was defective because it failed to allege the elements of a section 2320 offense, and that the government's evidence was insufficient as a matter of law to convict him.[1] His argument is a simple one: he cannot be found guilty of violating section 2320 because the language of the statute requires that a defendant both traffic in goods and knowingly use a counterfeit mark on or in connection with the goods. An individual who merely traffics in a mark which is unattached to any goods, Mr. Giles contends, does not fall within the ambit of section 2320.

To convict Mr. Giles under section 2320, the government must prove that he: (1) trafficked or attempted to traffic in goods or services; (2) did so

---

[1]Mr. Giles additionally asserts the evidence was factually insufficient to sustain his conviction because it was actually Ms. Notaro who made most of the arrangements to ship the patch sets. Because we decide this case based on the legal question, we do not reach the factual issue.

intentionally; (3) used a counterfeit mark on or in connection with such goods and services; and (4) knew the mark was counterfeit. *See United States v. Sultan*, 115 F.3d 321, 325 (5th Cir. 1997). In order to determine whether the government has succeeded, we must answer a series of questions addressing the relationship between Mr. Giles' activities and the statute at hand. In so doing, we keep in mind that when the wording of a statute is ambiguous and its legislative history fails to clarify which interpretation is correct, a court should apply a policy of lenity and construe the statute in favor of the criminal defendant. *See Ladner v. United States*, 358 U.S. 169, 177 (1958); *United States v. Wilson*, 10 F.3d 734, 736 (10th Cir. 1993).

> [W]hen choice has to be made between two readings of
> what conduct Congress has made a crime, it is
> appropriate, before we choose the harsher alternative, to
> require that Congress should have spoken in language
> that is clear and definite. We should not derive criminal
> outlawry from some ambiguous implication.

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952).

## A. Are the Patch Sets "Goods"?

The statute on its face refers to trafficking in "goods," and using the counterfeit mark "on or in connection with such goods."[2] Thus, whether Mr.

---

[2]"Whoever intentionally traffics or attempts to traffic in goods or services and
(continued...)

Giles can be found guilty of violating section 2320 depends in part on how we define the term "goods." The government would have us adopt the following syllogism: because the patch sets were sold for a price, they are merchandise; merchandise by definition is goods; therefore, the patch sets qualify as goods under section 2320, and Mr. Giles can be held criminally liable for trafficking in them. The district court agreed. *See App.* at 21 ("[T]he Court finds the logos in this case constitute "goods."). While this logic has some appeal, we are not convinced the inquiry is so simple.

Neither section 2320 nor the Lanham Act, 15 U.S.C. §§ 1051 *et. seq.* (the section's civil counterpart), defines the term "goods." An examination of other definitions contained within the two statutes, however, indicates that "goods" were intended to be viewed as separate and distinct from the marks they carry. Section 2320 defines "counterfeit mark" as "a spurious mark that is used *in connection with goods* ." 18 U.S.C. § 2320(e)(1) (emphasis added). The Lanham Act defines "trademark" as "any word, name, symbol, or device, or any combination thereof used . . . to identify and distinguish . . . goods." 15 U.S.C. § 1127.

---

[2](...continued)
knowingly uses a counterfeit mark on or in connection with such goods or services shall, if an individual, be fined not more than $2,000,000 or imprisoned not more than 10 years, or both. . . ." 18 U.S.C. § 2320(a).

The issue is made complex because a trademark is easily conceived of as an abstract symbol or design which is carried by the tangible goods at issue. In reality, this mark itself often consists of a tangible item such as a label, a patch, or a medallion (collectively referred to in the remainder of this opinion as "labels"). [3] The question comes down to whether this label can be considered a good if it is disconnected from its host good and sold for a profit.

This question was the subject of the court's opinion in *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir. 1975). There, the National Hockey League and several of its member teams brought a trademark infringement action against a company that made and sold embroidered cloth patches of the teams' registered trademarks. Retail customers could then buy the patches and sew them on to jackets or caps. The plaintiffs sued the defendants for violating provisions of the Lanham Act. The Fifth Circuit recognized that "[t]he difficulty with this case stems from the fact that a reproduction of the trademark itself is being sold, unattached to any other goods or services. The statutory and case law of trademarks is oriented toward the use of such marks to sell something other than the mark itself." *Id.* at 1010. The

---

[3]We do not concern ourselves here with the issues presented by service marks, and the level of association in advertising or displays that would constitute a "use" of the mark to identify services. *See* Rudolf Callman, 4A *Law of Unfair Competition, Trademarks & Monopolies* § 25.27 (4th ed. 1999).

Fifth Circuit concluded that, *in that case,* the goods and the trademark were coextensive; the patch was the actual "good" and the trademark was the thread design embroidered upon it. Trafficking in the emblems thus constituted a trademark violation:

> The[] emblems are the products, or goods, which defendant sells. When defendant causes plaintiffs' marks to be embroidered upon emblems which it later markets, defendant uses those marks in connection with the sale of goods as surely as if defendant had embroidered the marks upon knit caps. *The fact that the symbol covers the entire face of defendant's product does not alter the fact that the trademark symbol is used in connection with the sale of the product* .

*Id.* at 1011- 12 (emphasis added) (citation omitted).

While the court below relied heavily on *Boston Professional* , we believe that case to be of limited value for several reasons. First, it dealt with civil liability, while Mr. Giles was convicted of violating the criminal version of the statute, which we must construe narrowly, *see supra* . Moreover, the Fifth Circuit specifically confined its opinion to the product at hand:

> We need not deal here with the concept of whether every artistic reproduction of the symbol would infringe upon plaintiffs' rights. We restrict ourselves to the emblems sold principally through sporting goods stores for informal use by the public in connection with sports activities and to show public allegiance to or identification with the teams themselves.

*Boston Professional* , 510 F.2d at 1011.

Finally, the court relied upon a novel and overly broad conception of the

-8-

rights that a trademark entails. In deciding that the emblems should be protected goods despite the fact that the plaintiffs had not registered their marks for use on patches, the court essentially gave the plaintiffs a monopoly over use of the trademark in commercial merchandising. [4] The court recognized it was "slightly tilt[ing] the trademark laws from the purpose of protecting the public to the protection of the business interests of plaintiffs." *Id.* The Ninth Circuit criticized this reasoning in *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.3d 912 (9th Cir. 1980), noting "this tilt was not slight but an extraordinary extension of the protection heretofore afforded trademark owners," *id.* at 919. The court explained, "our reading of the Lanham Act and its legislative history reveals no congressional design to bestow such broad property rights on trademark owners." *Id.* at 918. The Fifth Circuit itself later retreated from the *Boston Professional* reasoning. In *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977), the court rejected "any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the protection of our markets," *id.* at 389.

---

[4]The court based this decision on three factors: (1) the major commercial value of the emblems was derived from the efforts of the plaintiffs, (2) the defendant sought, and could have obtained an exclusive licensing arrangement to sell the emblems, and (3) the sale of a reproduction of the trademark itself on an emblem is an accepted use of team symbols in connection with the type of activity in which the business of professional sports is engaged. *See Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1011 (5th Cir. 1975).

For these reasons we decline to follow *Boston Professional* here. The "goods" at issue in this case are the purses and handbags to which the patch sets could be applied. The patch sets are not goods, but labels.

## B. Does Section 2320 Prohibit Trafficking in Counterfeit Labels?

In order for the government to prevail the statute must prohibit trafficking in counterfeit labels such as the patch sets. Section 2320 does not contain such a prohibition. Another criminal provision makes it illegal to traffic in counterfeit labels for specific products such as records, computer programs, and motion pictures. *See* 18 U.S.C. § 2318. Mr. Giles persuasively argues that if Congress had intended to outlaw trafficking in labels for other goods, it would have done so in this or another provision of the criminal code.

We have little case law to guide us in determining whether 18 U.S.C. § 2320, the criminal statute we are dealing with here, should be applied to trafficking in labels. [5] Because the statute does not so provide, we are persuaded

---

[5]In *United States v. Koehler*, 24 F.3d 867 (6th Cir. 1994), the court upheld a defendant's conviction for several offenses involving stolen and counterfeit auto parts. Among those offenses was one count of knowingly using a counterfeit mark in intentionally trafficking in the "labels and containers" for the auto parts. The issue we have raised here was not raised in *Koehler*. Consequently, the Sixth Circuit did not address whether the labels and containers should be considered "goods" for the purposes of section 2320, or whether the act of trafficking in copied labels alone is sufficient to sustain a conviction under section 2320.

(continued...)

-10-

that section 2320 does not forbid the mere act of trafficking in counterfeit labels which are unconnected to any goods. [6]

Moreover, the government is presented with another problem in prosecuting Mr. Giles. The statute limits the marks it protects to those that are "identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office." 18 U.S.C. § 2320(e)(1)(A)(ii). Criminal liability can only occur "if a spurious mark is used on or in connection with goods or services for which the genuine mark is actually registered . . . and is in use." S.Rep. No. 526, at 10 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3636. Dooney & Bourke's trademark registration gives the company the exclusive right to use its mark on handbags, briefcases, luggage, tote bags, ties, belts, leather key fobs, wallets, shoes, slippers, gloves, hats, and suspenders. It has made no attempt to register

---

[5](...continued)

[6]Of course, creating or trafficking in counterfeit labels could expose a defendant to liability as an aider and abetter in the substantive offense. *See* 18 U.S.C. § 2. In order to sustain a conviction, the government would have to show that the defendant's act contributed to the execution of the criminal activity and that he intended to aid in the commission. *See Sultan*, 115 F.3d at 325 n.4. The Government did not argue, and we do not consider, whether the defendant aided and abetted trafficking in counterfeit goods for selling counterfeit labels which were intended to be attached to counterfeit goods.

its trademark for use on leather patches or medallions.[7] The head of Dooney & Bourke's anti-counterfeiting program conceded that if the leather patch were attached to other unregistered items, such as blue jeans, it would not constitute a trademark violation.

Case law under the Lanham Act illustrates this point. In *Playboy Enter., Inc. v. Universal Tel-a-Talk, Inc.*, No. CIV. A. 96-CV-6961, 1998 WL 288423 (E.D.Pa. June 3, 1998), the defendants operated an Internet website featuring

---

[7]Had Dooney & Bourke wished to obtain trademark protection for the leather patches and medallions themselves as independent items of decoration or jewelry, it probably could have done so. In *Application of Penthouse Int'l, Ltd.*, 565 F.2d 679 (C.C.P.A. 1977), Penthouse sought to register its stylized key mark for items of jewelry, where the jewelry was essentially a three-dimensional embodiment of the mark. It encountered opposition from the Trademark Examiner, the court noted, because:

> The statute, and much of the case law, relating to trademarks is oriented toward use of a mark in connection with goods which do not (and most could not) take the form of the mark.
> . . . .
>
> . . . [Here, t]he design is the mark. Penthouse is not merely attempting to register a jewelry design as a trademark; it seeks to register its established mark used as a jewelry design.

*Id.* at 681, 682. The court concluded that Penthouse was entitled to register the mark as a jewelry design because the mark was recognized as a trademark and as an indication of origin, and because sales of the jewelry were likely to be triggered by the recognition of the mark. *See also Job's Daughters*, 633 F.2d at 919 (recognizing that a name or emblem could serve simultaneously as a functional component of a product and a trademark).

-12-

pornographic pictures. They used some of Playboy's trademarks, such as the well-known Rabbit Head, to advertise links to collections of photographs. The court found that Playboy failed to state an actionable claim because it had not registered its marks for use on Internet websites. "Thus, a claim for trademark counterfeiting lies only against a defendant's counterfeit uses of a mark on the same goods or services as are covered by the plaintiff's registration of that mark." *Id.* at *4. *See also Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 210, 218 (D.Md. 1988) ("[T]wo marks that serve to identify products in two unrelated markets may very well coexist without confusion in the public's eye. . . . Unlike a copyright, mere reproduction of a trademark is not an infringement.").

Our conclusions are supported by the distinction between trademarks and copyrights. A trademark is meant to identify goods so that a customer will not be confused as to their source. A copyright is intended to protect the owner's right in an abstract design or other creative product. These differing purposes inform the different rights each law creates. "Copyright law gives the author the right to prevent copying of the copyrighted work in any medium. Trademark law prevents the use of a similar mark on such goods or services as would probably cause confusion. Thus, the scope of rights in copyrights and trademarks is defined quite differently." 1 J. THOMAS MCCARTHY, *MCCARTHY ON TRADEMARKS & UNFAIR*

-13-

COMPETITION § 6.14, at 6-28 (4th ed. 1996). *See also Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) ("[W]hat new rights does the trade-mark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright."); *Speicher*, 877 F.2d at 534 ("The more fundamental point is that the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute."); *Job's Daughters*, 633 F.3d at 919 ("A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods.").

Mr. Giles' conduct did not confuse any consumer about the origin of goods because there were no goods involved in the transaction. We will not stretch the trademark statute into an area more appropriate to copyright law. *See Job's Daughters*, 633 F.2d at 919 (criticizing *Boston Professional* because it "transmogrifies this narrow [trademark] protection into a broad monopoly").

Section 2320 does not clearly penalize trafficking in counterfeit labels which are unattached to any goods. The statute's language, in fact, indicates otherwise. The legislative history on the topic is unavailing. We cannot say with confidence that Mr. Giles was adequately informed that the conduct in which he engaged could be a federal crime, or that section 2320 was intended to cover his

-14-

conduct. In any event, we must give him the benefit of the doubt. We hold that the allegations in the indictment failed to state an offense under section 2320.

The district court's order denying Mr. Giles' motion to dismiss the indictment is **REVERSED.** The case is remanded with directions to set aside the conviction and to dismiss the indictment.