$165, 524.78, Appellant,

v.

**The STATE of Texas, Appellee.**

No. 14–99–00200–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 5, 2001.

Renato Santos, Jr., Houston, for appellants.

Alan Curry, Houston, for appellees.

Panel consists of Justices ANDERSON, EDELMAN, and WITTIG.

## MAJORITY OPINION

EDELMAN, Justice.

Samuel Mares appeals a judgment forfeiting $163,000 to the State on the grounds that there is no evidence or insufficient evidence to support the jury's finding that the money seized from Mares's home and automobile was contraband. We affirm.

## Background

In early 1996, Harris County Sheriff's Deputy William Tipps received information from his father, James Godfrey, a Houston Police Officer, that narcotics activity was being conducted at 6841 Malibu. Tipps watched the house at that address on and off for six months looking for suspicious activity. On January 9, 1996, approximately six months after receiving the information from Godfrey, Tipps saw Mares leave the house carrying a Crown Royal bag and followed him. Mares was thereafter stopped and arrested for a traffic violation, and a search of his vehicle revealed the Crown Royal bag containing $18,000.00 in cash and two additional bags containing $1,220.78 and $1,304.00. A narcotics dog was called to the scene and made a positive alert for cocaine on all three bags. Officers also requested and obtained permission from Jody French, a resident of the house at 6841 Malibu, to search that residence. In the search, the police found containers of vitamin B powder, a television connected to an outdoor video monitor, small plastic bags, trash bags containing an odor of marijuana and some seeds,

and a safe containing $145,000.00 in cash and $14,000.00 in savings bonds.

The State brought an action to obtain a forfeiture of $165,524.78 of the money seized by the police. At trial, the jury found that the money was "contraband," and the trial court ordered forfeiture of $163,000.00 of it.[1]

## Requisites for Forfeiture

■ Property, including money, is subject to seizure and forfeiture if it is shown to be "contraband." *See* TEX.CODE CRIM. PROC.ANN. art. 59.02(a) (Vernon Supp. 2000). "Contraband" is property used or intended to be used in the commission of certain felonies, or proceeds derived from those felonies, including drug-related offenses described in section 481.112 of the Health and Safety Code. *See* TEX.CODE CRIM.PROC.ANN. art. 59.01(2)(A)-(C) (Vernon Supp.2000); TEX. HEALTH & SAFETY CODE ANN . §§ 481.102, 481.112 (Vernon 1992). The character of seized money as contraband, subject to forfeiture, must be proved by the State by a preponderance of the evidence. *See* TEX.CODE CRIM.PROC. ANN. art. 59.05(b) (Vernon Supp.2000). The proof may consist of circumstantial evidence. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex.1991).

## Legal Sufficiency

Mares's first and third points of error challenge the legal sufficiency of the evidence to prove that the money seized from his house and vehicle was contraband.

### Standard of Review

The two most recent and relevant civil forfeiture decisions from the Texas Supreme Court appear to apply different

---

1. The $163,000.00 consisted of the $18,000.00 found in the vehicle and the $145,000.00 found in the house. It thus did not include the remainder of the cash from the vehicle or the savings bonds.

standards to review legal sufficiency. In *$56,700.00,* police discovered money in Harry Farah's home, along with less than an ounce of cocaine, slightly more than an ounce of marijuana, and an array of drug paraphernalia, such as powdered vitamin B, scales, numerous vials, and two white "diamond folds" of paper with a cocaine residue. *$56,700.00 v. State,* 730 S.W.2d 659, 661–62 (Tex.1987). To explain the presence of the cash, Farah provided evidence of large cash transactions conducted by his business. *Id.* at 662. Despite reciting that the legal sufficiency standard considers only evidence and inferences tending to support the forfeiture and disregards all evidence and inferences to the contrary, the five to four decision held that the State's evidence was legally insufficient because *when considered with the contrary evidence,* it was equally consistent with an inference of illegal drug activity as with no such activity. *Id.* see also *id.* at 662–63 (Campbell, J., dissenting).

By contrast, in *$11,014.00,* officers found, in a passenger's suitcase, money wrapped in bed sheets, which a drug dog's positive alert indicated had also been in recent close proximity to a controlled substance. *State v. $11,014.00,* 820 S.W.2d 783, 785 (Tex.1991). Although officers claimed the passenger appeared very nervous, stood off from the other passengers, continuously scanned the area looking back and forth in a suspicious manner, and was carrying only a single suitcase, which appeared to be very light, they did not find any drugs in his possession, nor did they see any exchange of narcotics. *Id.* at 784. The passenger in possession of the money testified that he had borrowed it from relatives in order to purchase a van. *$11,014.00 v. State,* 808 S.W.2d 288, 289–90 (Tex.App.—Houston [1st Dist.] 1991), *rev'd,* 820 S.W.2d 783 (Tex.1991). The Court of Appeals held that the evidence raised no more than a surmise or suspicion concerning the likely source or use of the money and reversed the forfeiture. *Id.* at 291. Reversing the Court of Appeals, the Texas Supreme Court considered only the circumstantial evidence supporting the forfeiture and held, per curiam, that it was legally sufficient to support an inference that the money was derived from the sale and/or distribution of a controlled substance. *$11,014.00,* 820 S.W.2d at 783, 785. Given the apparent disparity in approach between *$56,700.00* and *$11,014.00,* we will follow the latter because it is the more recent and more unanimous Texas Supreme Court decision on point.

### Legal Sufficiency Review

According to Mares, the State did not present any direct evidence of a delivery or intent to deliver cocaine by Mares or anyone else at 6841 Malibu, and the State's circumstantial evidence failed to provide a sufficient nexus between the money and a drug-related felony. He contends that the State's evidence merely showed that items present at the house were consistent with drug activity, but not that the money seized was actually connected to any drug activity.

When evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The "equal inference rule" similarly provides that meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to support a finding. *See, e.g., Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998).

Although the equal inference rule is well recognized, its application in determining

the extent to which inferences can validly be drawn from circumstantial evidence in order to support a particular judgment has been a subject of considerable disagreement. *See, e.g., Lozano v. Lozano*, 44 Tex. Sup.Ct. J. 499, 503–04, —— S.W.3d ——, —— – ——, 2000 WL 33216152 (March 8, 2001) (Phillips, C.J., concurring and dissenting); *id.* at 509–14, —— S.W.3d —— (Hecht, J., concurring and dissenting); William V. Dorsaneo, III, *Judges, Juries, and Reviewing Courts*, 53 SMU L.REV. 1497, 1507–11 (2000). One view focuses on the meagerness of the circumstantial evidence rather than whether it supports conflicting inferences equally or unequally:

> Properly applied, the equal inference rule is but a species of the no evidence rule, emphasizing that when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence. But circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable, subject only to review by the trial court and the court of appeals to assure that such evidence is factually sufficient.

> Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. And this choice in turn may be influenced by the fact finder's views on credibility. Thus, a jury is entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe.

*Lozano*, 44 Tex. Sup.Ct. J. at 503–04, —— S.W.3d —— (Phillips, C.J., concurring and dissenting) (citations omitted). The contrary view asserts that, to support an inference, not only must the circumstantial evidence be more than slight, but the inference to be drawn must be more probable than other reasonable inferences:

> It is true: that circumstantial evidence so slight that any plausible inference is purely a guess is no evidence; that circumstantial evidence is not legally insufficient merely because it supports more than one reasonable inference; that a fact finder may be required, and is entitled, to choose between competing reasonable inferences; and that this choice may require assessments of credibility. But these propositions do not resolve the issue here, which is: if circumstantial evidence supports two reasonable inferences, neither of which is any more likely than the other, can a jury pick one? The "equal inference" rule says no. It is not enough that one inference is as reasonable as another; to be given weight, an inference must be more probable than others....

> The passage quoted above from CHIEF JUSTICE PHILLIPS' opinion, distilled to its essence, says: ... 'If more than one reasonable inference can be drawn from a fact or circumstance, and neither is more probable than the other, then a jury can pick whichever one it wants, and it may choose the inference urged by a party who is otherwise more credible.'

*Id.* at 511, —— S.W.3d —— (Hecht, J., concurring and dissenting) (citations omitted).

■ In this case, the record reflects that small plastic bags, an outdoor video monitor, vitamin B powder, and trash bags with marijuana seeds were found in the residence in which a large amount of cash was also located in a safe. According to the testimony, small plastic bags are commonly used to package cocaine, and vitamin B powder is commonly used to "cut"

cocaine. Additionally, the inside walls of the safe contained 1.8 milligrams of cocaine, and the money from both the safe and Crown Royal bag tested positive for the presence of cocaine.

We believe that, taken together, this circumstantial evidence is adequate not only: (1) to support more than a mere surmise or suspicion that the confiscated money was used in, intended to be used in, or proceeds from, the commission of a drug-related felony; but also (2) to establish, even under the more restrictive version of the equal inference rule, above, that that inference is more probable than any inference therefrom that the money was not so used. Therefore, the evidence is legally sufficient to support the judgment, and points of error one and three are overruled.

## Factual Sufficiency

Mares's second and fourth points of error challenge the factual sufficiency of the evidence to prove that the money seized from his house and vehicle was contraband. Mares contends that his explanation for the source of the money rebutted the evidence that the money was used or intended to be used in the sale of illicit drugs.

### Standard of Review

■ When considering a factual sufficiency challenge, we consider all of the evidence, not just that which supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998). We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. However, we may not assess the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id.*

### Factual Sufficiency Review

■ Mares's factual sufficiency challenge relies on the following evidence. Tipps admitted he watched Mares's residence for six months without observing any type of drug activity there. Tipps also admitted he did not have any reason to believe that there was a drug business going on at the house other than the information he received from Godfrey. In addition, Mares produced evidence of funds he received from his father's estate and the sale of rental property. He also presented evidence that his jewelry business, car repair business, and rental properties all were cash businesses. Additionally, evidence was presented that the surveillance camera was at the house because it had been burglarized, that Mares and his son used vitamin B when they worked out, and that the small plastic bags were used in Mares's jewelry store to hold jewelry.

Although there was conflicting evidence, the jury's finding that the money was contraband is not so contrary to the overwhelming weight of the evidence as to be manifestly wrong and unjust. Accordingly, Mares's second and fourth points of error are overruled, and the judgment of the trial court is affirmed.

WITTIG, Justice, dissenting.

*"Sed quis custodial ipsos custodes?"* [1]

Seemingly, the greatest casualty of the war on drugs is the Constitution. Houston drug enforcement officers hastily seized contraband amounting to an astonishing one one-thousandth of an ounce (0.001

---

1. "But who will guard the guards?" Juvenal, (Decimus Junius Juvenalis, c. 60–140 AD. Roman poet).

ounce). To accomplish this feat, they raided a Houston home without a warrant and held virtually hostage a surely innocent toddler. While still holding the infant, the government seized not only all of Samuel Mares' cash in his car, but also wheeled out his home safe and its contents. Based on this 0.001 ounce mountain of evidence, the government steals away with another victory in the war on drugs; the victory is sealed by trampling our most sacrosanct of laws. I respectfully dissent.

The State seized $165,524.78 cash and United States Savings Bonds from Samuel Mares' home and automobile in 1996. A jury awarded most of the seized cash to the State but found in favor of Mares on three items of cash and the bonds. I will examine the quantum of proof necessary for the government to seize and forfeit $163,000 cash and bonds from a Texan. In the examination of proof, both the majority and I note that circumstantial evidence is sometimes treated disparately by Texas Supreme Court. I also seek to reconcile those authorities to answer this sufficiency challenge in the context of civil forfeitures. "It makes sense to scrutinize governmental action more closely when the State stands to benefit." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 56, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 979, n. 9, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of Scalia, J.)).

### Background

In 1995, a Harris County Sheriff's drug enforcement deputy, received a tip from his father, a Houston police drug enforcement officer, that narcotics activity was suspected at a Malibu house address, Mares' home. All deputies and Houston police involved in this case work in narcotics; none worked in traffic or other divisions. The house was watched for suspicious drug activity intermittently for six months. None was observed. In January 1996, Mares left his home accompanied by his young 15 month old child. Because on this particular trip Mares carried a Crown Royal bag, narcotic officers arranged a pretext traffic stop by other narcotic officers, resulting in the arrest and jailing of Mares as well as the seizures. The child was also held against the protestations of his mother. The arrest occurred near Mares' work destination. The search incident to the pretext stop arrest produced three of the five seized items from Mares' vehicle. In the Crown Royal bag was $18,000 cash. Two paper sacks containing $1304.00 and $1220.78 respectively were also seized but later returned in accordance with the verdict. Although a narcotics dog ordered to the scene alerted on all three items, only one item later tested positive for an unascertainable amount of contraband. While holding her 15–month–old child in the rear of a police vehicle for over three hours, police obtained the consent of another occupant of the Malibu house, Jody French, the notably upset mother of the 15–month–old toddler.

Moving to the Malibu house, the multi-car narcotics task force conducted a warrantless search of the house and garage. They found an outdoor video monitor, motorcycle memorabilia, Vitamin B, plastic jewelry bags in the desk, and trash bags in the garage, perhaps containing marijuana odor and some seeds. While the police noted the trash bags at the scene, they were not part of the evidence seized or adduced, were not tested, and the narcotics dog did not alert to this uncorroborated observation. The dog did alert, however, to a sealed and locked safe. The safe and contents were immediately seized and taken into police custody. Later, a warrant was obtained and the safe opened. The contents of the safe produced $145,000 cash and $14,000 U.S. Savings Bonds.

This cash and the bonds I call items 4 and 5, for the sake of a proper sufficiency reviews, and to examine the mixed jury findings.

The State brought an action to forfeit all the previously seized money *and bonds*. A jury awarded the government the contents of the Crown Royal bag and safe, which included items 1, ($18,000 cash) and 4 ($145,000 cash). However, the jury did not find items 2 ($1304), 3 ($1220.78) and 5 ($14,000 in bonds) to be contraband. In other words, Mares prevailed on these three items seized. Inexplicably, the trial court refused to order the return of the U.S. Savings Bonds. By omission, the majority affirms this abrogation of the jury verdict. For this and other reasons recited, I would reverse and render the judgment below.

### Requisites for Forfeiture

The majority correctly recites forfeiture requisites. While the majority gives begrudging lip service to the dual inference rule, it does not properly apply the rule either in its legal sufficiency or factual sufficiency analysis. Mere circumstantial evidence evoking equally plausible but opposite inferences is speculative and hence legally insufficient to support a finding. *Wal–Mart v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998); *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 661 (Tex.1987). The application of this principle is the primary point of departure between the majority and the dissent. Neither, however, does the majority demonstrate: 1.) A substantial connection between the bonds and cash and a felony drug deal; 2.) Probable cause for seizure; or 3.) That it more probable that innocuous items of jewelry

bags, vitamins, video or cash were intended or used in a felony drug transaction.

### The Dual Inference Rule and Forfeiture Requirements

In 1987, a divided Texas Supreme Court considered our issues. The court materially noted the purpose of forfeiture laws was to facilitate forfeiture of assets used by drug dealers. *$56,700*, 730 S.W.2d at 661. The court mandated in forfeiture proceedings the State show probable cause for seizing a person's property. *Id.* The court held the Texas Constitution requires a reasonable belief that "a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute." *Id.* (internal citations omitted); Tex. Const. art. I, § 9. Indeed, not only in the Section 9 search and seizure area (Fourth Amendment of U.S. Constitution) but also every seizure must, per force, involve the Constitutional dimension of due process of law under both the Fifth and Fourteenth Amendments of the U.S. Constitution. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 52, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *see also* Tex. Const. art. I, § 19. "Here the Government seized property not to preserve evidence of wrongdoing, but to assert ownership and control over the property itself. Our cases establish that government action of this consequence must comply with the Due Process Clauses of the Fifth and Fourteen Amendments" *James Daniel Good*, 510 U.S. at 52, 114 S.Ct. 492. Additionally, the Eighth Amendment "excessive fines" clause of the U.S. Constitution may also be implicated when there exists disproportionality between the forfeiture and the gravity of the offense.[2] *United States v. Bajakajian*, 524

---

**2.** Here there exists at most proof of 0.001 ounces of cocaine yet $145,000 plus $14,000 in bonds are seized from a home, without prior notice or hearing. No such constitutional challenge was raised here.

U.S. 321, 334–35, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). In *$56,700*, the court also correctly held "meager circumstantial evidence giving rise to inferences which are equally consistent with the proposition" or when circumstances are consistent with either of two facts with nothing showing one is more probable "neither fact can be inferred." *Id.* at 662. Though certainly it is not necessary in the criminal or civil context to eliminate "every reasonable hypothesis," logic, truth, law and morality all demand a hypothesis of equal or greater probability be eliminated. The U.S. Court of Appeals for the Fifth Circuit still states: "... we must reverse a conviction if the evidence construed in favor of the verdict 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charge.'" *U.S. v. Sultan,* 115 F.3d 321, 325 (5th Cir.1997) (internal citation omitted).

There is a problem with the overly broad concept that "direct and circumstantial evidence are equally probative." *Hankins v. State,* 646 S.W.2d 191, 199 (Tex. Crim.App.1981). Not necessarily. The application depends quintessentially on the *probabilities* of the circumstantial evidence inference construct. It would be better said that both types of evidence *may* be equally probative to expressly allow for the logical problem of equivocal or equal inferences. When a factfinder can make an arbitrary choice between equally probably but unproved conclusions, the finding would be based not on evidence but in part on mere speculation and conjecture; in such a case *the burden of proof would be shifted to the defendant to disprove* the act. *Western Tel. Corp. of Texas v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898–99 (1937) (emphasis added). If the 1987 supreme court went awry in the application of the law to the facts, it was still correct in the statement of these time-honored principles. *$56,700* is still good law

both for its vital constitutional observations and its proper treatment of conflicting circumstantial evidence. We likewise noted these principles in *$9,050 v. State,* 874 S.W.2d 158, 162 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

These views seemed to be shared by our current supreme court. The law still requires probable cause defined as a reasonable belief that a "substantial connection" exists between the property forfeited and the criminal activity defined. *State v. $11,014,* 820 S.W.2d 783, 784 (Tex.1991). As Justice Hecht noted by dissent in *Lozano v. Lozano,* 44 Tex. Sup.Ct. J. 499, —— S.W.3d ——, ——, 2000 WL 33216152, at * 8–9 (Tex. March 8, 2001), the high court reached opposite *results* in *$56,700* and *$11,014.* In *$11,014,* a 19–year Houston police veteran with special training and experience in drug courier profiling, observed a very nervous passenger deplanning from a known drug route. While following the suspect, the transient continued to scan the airport, looking back and forth. When approached by the officer, the suspect had no ticket, testified to be common conduct of drug dealers designed to conceal their identity. The transient was traveling under an assumed name, was Jamaican, but lacked proper immigration papers, had a large bundle of cash in his pockets, and more in his suitcase, wrapped in rubber bands and bed sheets. Expert testimony showed marijuana was smuggled out of Houston wrapped in bed sheets. Only three or four garments were in the suitcase. A certified dog also alerted to both the suit case and the money. Expert testimony this indicated *recent* close proximity to a controlled substance. But a careful reader will notice the conflicting circumstantial evidence rule is neither raised nor discussed. Instead the brief *per curiam* opinion cites the lesser rule that any ultimate fact may be proved

by circumstantial evidence. *Id.* at 785 (citing *Farley v. M.M. Cattle Co.*, 529 S.W.2d 751, 755 (Tex.1975)).

Notwithstanding, when proof in commercial, personal injury and tort cases are in question, the quantum of circumstantial evidence necessary to have "some evidence" is more than 0.001 ounces of a substance or equally possible inferences. In this context of money damages for injuries, the supreme court talks of circumstantial evidence in terms of "probability" not "possibility." *Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998). *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex.1995). In *Wal–Mart*, the court boldly reiterates "meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to support a finding." *Id.* (citations omitted.) For context, *Wal–Mart* is a slip and fall case and the question of knowledge by Wal Mart was the core issue. The cause of the injurious fall was macaroni. The suspect macaroni had mayonnaise in it, was fresh, wet, humid, contaminated with dirt, cart tracks and even had footprints defacing the food. Plaintiff's daughter opined it seemed to have been there a while. Justice Gonzales, however, more potently opined that dirt in macaroni salad on a heavily traveled aisle is no evidence how long it was there. *Id.* at 937. The evidence would support the opposite inference of quick contamination. Footprints support both an inference of fresh or ancient. *Id.* Opinion testimony that the macaroni "seemed like it had been there awhile" is "mere speculative, subjective opinion of no evidentiary value." *Id.* at

937–38. The plaintiff only proved a *possibility*. *Id.*[3]

Our supreme court had already held that "suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex.1993). Similarly, when relying on circumstantial evidence, the State must offer proof more that a mere surmise or suspicion regarding the source of the money. *$4,182 v. State*, 944 S.W.2d 24, 27 (Tex. App.—Texarkana 1997, no pet.).

While it is true that circumstantial evidence does not have to exclude every possible hypothesis, binding Texas precedent in civil circumstantial evidence cases requires for legal sufficiency: 1.) More than suspicion linked to other suspicions; 2.) Proof more than mere surmise or conjecture; 3.) Evidence that is more probable than not; and 4.) Meager circumstantial evidence that supports equally plausible but opposite conclusions is speculative (hence no evidence). Stated otherwise, "It is a rule of logic, as well as law, that when the existence of a fact does not make one possible inference more probable than another, no inference can be drawn at all." *Lozano*, —— S.W.3d at ——, 2000 WL 33216152, at *6 (Hecht, J., dissenting).

## Legal Sufficiency

In determining a legal sufficiency challenge, we are to consider only the evidence that supports the trial court finding. *$11,014*, 820 S.W.2d at 785. Any ultimate fact may be proved by circumstantial evidence. *Farley*, 529 S.W.2d at 755. The State must offer proof more than a mere surmise or suspicion. *$4,182*, 944 S.W.2d at

---

3. Were one to substitute "money" for macaroni, most could see by analogy that we not only do not know when the money was put in the safe or bag, but also we know not why, how, who or where the money came from. One could at least infer the macaroni came from the store. That the source of the money was felonious, is surmise emboldened by conjecture.

27. Suspicion linked to other suspicion produces only more suspicion which is no evidence. *Browning–Ferris*, 865 S.W.2d at 927. Circumstantial evidence from which equally plausible inferences may be drawn is legally insufficient. *Wal–Mart*, 968 S.W.2d at 936; *$56,700*, 730 S.W.2d at 661. Did the State prove by legally sufficient evidence a substantial link between the seized money/bonds and a drug related felony?

First, I note the jury did not find items 1, 2, and 5 to be contraband, ($1304, $1220.78 and $14,000 in U.S. Savings Bonds). Therefore, the trial court clearly erred by refusing to return the savings bonds to the appellant, Mares.[4]

The evidence relied upon by the government, shows the Mares residence was watched for six months during which no drug trafficking was evident. Deputy William Tipp's monitoring was itself based solely on a "tip." Not until Mares left the house with a Crown Royal bag accompanied by his 15 month old boy did the police take action and stop him on a pretext basis. Deputy William Tipp arranged the stop through his son, Officer Bobby Tipp.

The two traffic offenses[5] for which Mares was arrested were dismissed.[6]

The Mares house had a outdoor video monitor which could be viewed on a television set. Officer Bart Beddingfield opined this video monitor was "kind of suspicious." His opinion suggested, this was only a modest $80,000 or $90,000 house. Mares carried a Crown Royal bag, (sometimes used by drug dealers, the same bag actually used to carry Crown Royal, marbles, sewing patches, and other lawful items). Vitamin B was found but Sgt. Juan Johnson said that though the vitamin "could" be used to cut cocaine, it was "not illegal." The strongest evidence by the government was the presence of 0.0018 grams (0.001 ounces)[7] of cocaine inside the safe. Officer Kim Downs, a firearms examiner and chemist, testified the total amount was so infinitesimal that it could not be weighed on a scale. He used a "UV test" which, thru a light process, determines minuscule microscopic amounts. The chemist also found a dirty cotton swab, presumably left by officers, that had the coloration of cocaine after a field test but this could not be chemically lab tested.[8] The safe was not tested by the chem-

---

4. Magnanimously, Mares was allowed to use some of his savings bonds for an appeal bond.

5. Officer Bobby Tipps, HPD narcotics, testified he ordinarily did not give tickets and certainly did not arrest people for traffic tickets. However, on this particular occasion his father called him and ask him to make a traffic arrest (in the event of any traffic violation.) The arrest was made after this officer joined forces with Beddingfield and his brother, William Tipps.

6. While one of the offenses that sent Mares to jail was arguable, changing lanes without a signal, the other action likely was not an offense. Mares moved his vehicle from northbound Loop 610 in Houston through the interchange with U.S. 290 and went from the far left lane into the far right lane and exited. Judicial notice of Interstate and United States

highways would indicate that is often not only a lawful maneuver, but required in order to exit the freeway.

7. I note that 1 gram = 0.03 ounces. Patently, 1.8 mg = 0.0018 grams. Found by UV light was 1.8 mg which, for perspective, = .0018 grams or 0.001 ounces. One grain = 0.064799 grams. A grain is equivalent of a plump grain of wheat. So the light-measured quantity here is 0.0278 grains. This quantity is so *de minimus*, it cannot be seen or weighed by any traditional laboratory means. This is the quantum of proof, according to the majority, that makes vitamins, jewelry bags, cash and bonds all part of a sinister plot to deal drugs.

8. I do not suggest drug enforcement officers planted cocaine, but merely observe that the safe was handled by many people, contents

ist until after considerable handling by drug enforcement officers including the removal of $145,000 in cash and $14,000 in savings bonds. Contrary to the State's brief and argument, the firearms examiner/chemist testified it was not inconsistent or unreasonable to get 0.0018 grams of cocaine off $145,000 in circulated $100 and smaller bills. The expert's exact words were: "Correct. I would agree with that." Studies show that most U.S. denomination bills in circulation have traces of cocaine.[9] Kim went on to speculate in answer to the government's leading question that the microscopic cocaine "could have been there as a result of kilos being there." The gravamen of the government's case centers on a microscopic amount that cannot be seen or measured, that could innocently come from the bills themselves, or "could have been ... a result of kilos." Indeed,

some of the bills in the safe and some in the Crown Royal bag had imbedded cocaine. There is no evidence of a past or future sale, receipt, manufacture or distribution of drugs.

There were some other opinions: garbage bags in the garage that "smelled" like marijuana but the trained and sophisticated narcotics officers didn't seize or bring as evidence, and that was undetected by the dog. There were small plastic jewelry bags in a desk drawer, also undetected by the dog. Then there is positive dog evidence: it alerted on the Crown Royal bag (containing $18,000) that tested an unmeasurable trace, the sealed safe, and two sacks in the automobile. Although the canine alerted to two sacks money with $1,220.78 and $1,304.00 respectively, the contents tested negative for narcotics.[10]

removed, and door left open by police. In the *Havner* context, this evidence would be summarily rejected as "no evidence." *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997). At the same time, growing scientific evidence points to the ubiquitous presence of cocaine. A 1993 study by independent government laboratory Argonne National Laboratory indicated 78% of one-dollar bills in suburban Chicago were contaminated with cocaine. A single bill (1 of 278) had 1.05 milligrams of cocaine. Random samples in Miami and *Houston*, were *more contaminated* than Chicago. *See New Research may Help Bring Drug Dealers to Justice.* ARGONNE NEWS (April 7, 1997), *at* http://www.anl.gov/OPA/ local/news97/an970407.html# story1. Still the majority seems to sleep well at night when all the cash involved in this case produced the grand total of 1.6 milligrams of cocaine-which can only be measured by UV light.

9. The U.S. Court of Appeals for the Sixth Circuit, based on the high frequency of cocaine contaminated money, observes "evidence of a positive identification by a drug-sniffing dog may have minimal evidentiary value." *U.S. v. Buchanan*, 213 F.3d 302, 311 (6th Cir.2000) "We agree that this dog-sniff evidence was inherently unreliable and that

the court abused its discretion in admitting it." *Id.* at 315. (Jones, J., concurring) (majority finding harmless error in overruling FED.R.EVID. 403 objection.) Fort Worth Federal District Judge Belew notes the general contamination of U.S. currency. "There is some indication that residue from narcotics contaminates as much as 96% of U.S. currency currently in circulation." *U.S. v. $80,760,* 781 F.Supp. 462, 476 (N.D.Tex.1991), *aff'd,* 978 F.2d 709 (5th Cir.); *see also* Andy G. Rickman, *Currency Contamination and Drug Sniffing Canines: Should Any Evidentiary Value be Attached to a Dog's Alert on Cash?* 85 KY. L.J. 199 (1997). This article delineates many of the studies of currency contamination.

10. Multiple errors of form and substance permeate this trial. First I note the prosecutor's unbridled use of the term "narcotic." *E.g.,* "This is a narcotics case." "This was a narcotics traffic stop." Repeating the word for as many as a hundred times, the government easily replaces proof with rhetoric. This type of "spin" in a trial should not, in my estimation, be tolerated. The only narcotics proven could be found on virtually all currency in circulation. Similarly, I note the prosecutor was allowed to commit the jury to virtually the exact fact situation during voir dire exam-

The dog also alerted to a locked study door, but an undoubtedly thorough investigation and chemical analysis revealed nothing.

As the State correctly states in its brief, the required elements need prove that the contraband seized and sought to be forfeited was used or intended to be used in a drug related felony or was proceeds from such a felony. TEX.CODE CRIM.PROC.ANN. art. 59.02 (Vernon 2000). The proof simply does not support any possession with intent to deliver cocaine thus making TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon 2000) inapplicable (mere possession of controlled substance). There was no useable or deliverable quantity of cocaine in Mares' possession. But in any event, the contest is not about the return, if possible, of 0.0018 grams of cocaine. Rather, the State's case must prove the *money/bonds* seized were proceeds from a cocaine sale or were to be used for the felony delivery or possession of cocaine. Here, the money and bonds were the contraband seized, not drugs. Sadly, the court's charge confuses the contraband money with cocaine and eliminated the requisite intent to deliver.[11] Nonetheless, we must concern ourselves with what *commercial undertaking violative of the Controlled Substances act occurred? $8,500 v. State,* 774 S.W.2d 788, 793 (Tex.App.— Houston [14th Dist.] 1989, no writ). There is no evidence, circumstantial or otherwise, to prove any substantial connection between the cash and the requisite felony offenses.

Some case illustrations of sufficiency of the evidence are instructive. In *$8,500,* this court found legal and factual sufficiency when the respondent drove the car to at least three meetings with undercover narcotics officers to discuss the *sale* of marijuana. The respondent "offered no explanation as to any other source of this large accumulation of cash." *Id.* In *Valles v. State,* 646 S.W.2d 636 (Tex.App.—Houston [1st Dist.] 1983, no writ), the respondent had seven ounces of heroin (felony amount), admitted to *dealing* heroin to support his family, was not working and showed officers ten $1,000 bills hidden under a chest of drawers. Perhaps the two closest fact scenarios to ours (excluding

ination. The government was allowed, without special exceptions, to plead generally, entire chapters of the penal code simply by number and without substance or content. Thereafter, the *charge of the court was fundamentally flawed when it allowed confiscation without the requisite intent to manufacture/deliver or as proceeds of a felony.* Specifically, the jury was allowed to confiscate the *money* for mere possession of any trace of *cocaine.* In the last sentence of the penultimate paragraph, the court deleted the statutory language "*with intent to manufacture or deliver.*" Instead the trial court instructed on TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon 2000), a drug possession offense. *Drugs* were not seized. *Money/bonds* were seized. Thereafter the jury was simply asked if there was contraband, not whether the money was contraband. Of course, under the penal code possession cocaine can be contraband but is *not the contraband seized and forfeited.* The jury was so left to speculate and indeed concluded that cash without a microscopic trace of "contraband" would be returned but cash with either an unmeasurable trace or with 0.0018 grams was contraband to be confiscated! The confusing charge of the court, standing alone, explains this jury verdict. Over proper objection the trial court allowed evidence of a 1985 arrest for conspiracy. The defense was prohibited from completing its cross examination of the chemist Kim on equally plausible inferences by an erroneous government objection sustained by the court. While these myriad errors are not brought forth on appeal, they can explain the jury verdict on a basis other than evidence. And as we move into the 21st century, one would hope these types of fundamental errors would be diminished, not increased. Yet the insidious diminution of due process and liberty persists, unabated.

11. See footnote 10, above.

$56,700) are found in $17,590 and $2,067. In the former, respondent Spurs was stopped on a non-pretext basis for a routine traffic violation. Legal sufficiency was based upon circumstantial evidence including a maroon bag with $17,590, covered with a .44 magnum, the smell of marijuana plus marijuana debris throughout the vehicle, another .357 magnum, plus a ledger with symbols documenting *sales* of marijuana. The ledger balance was within $50 of the cash amount present in the bag and respondent admitted ownership of all. Respondent did testify the book was from his bar but expert testimony directly contradicted this. The nexus of the seized funds and felony commercial activity was shown by the proximity of the money, weapons, marijuana and ledger. *$17,590 v. State*, 850 S.W.2d 611, 614 (Tex. App.—Tyler 1993, writ denied). "[I]t is more reasonable than not that recovered money was derived from the sale of controlled substances." *Id.* Finally, there is a Crown Royal bag case which demonstrates insufficiency. A memo pad with wording "Inventory" "B½" and "G½" was found inside a Crown Royal bag with $1000. There was also present various pills and empty capsules. While the state argued this was drug inventory, the arresting officer lacked expertise and *could not connect the symbols to contraband.* *$2,067 v. State*, 745 S.W.2d 109 (Tex.App.—Ft. Worth 1988, no writ). Our case clearly does not fall within the legal sufficiency required by standing case law.

The proof attempts to weave a web of suspicion and prejudice into the fabric of legal sufficiency. The officer's testimony about the "possibility of a kilo," the "suspicious video," vitamins, plastic bags and 0.001 ounces, do not add up to $163,000 worth of past or future cocaine deals. No inference should be drawn from uncertain premises. *Missouri Pacific R. Co. v.*

*Porter*, 73 Tex. 304, 11 S.W. 324 (Tex. 1889).

### The Legal Sufficiency Dilemma

Under the circumstantial evidence rules enunciated in *$56,700, Browning–Ferris*, and *Wal–Mart, etc.*, the government, in order to survive a legal sufficiency challenge, would also have to eliminate or disprove the "equally plausible inference." This is alluded to by the majority. However, the majority does not apply the equal inference rule. Similarly, the majority eviscerates both this rule and the need for probabilities, not possibilities, by reviewing the evidence thru the myopic lens of the government. The rather abbreviated *per curiam* opinion essentially relied on by my colleagues, *$11,014*, does not actually address the circumstantial evidence rules recited above. Yet in this case, the defense has raised this precise issue repeatedly, from the trial, to the motion for new trial, and now before us. When the majority finally acknowledges the need for probabilities, they then ignore the rule in their factual review as well as their analysis. The trial judge candidly stated in open court he was not going to follow the Texas Supreme Court precedent of *$56,700*. If by that statement, he alluded to the supreme court's sometime disparate treatment of circumstantial evidence, such a position would be arguable. If, however, he meant he would not require constitutional level of proof, apply the "equally plausible inference" rule, or the "substantial connection rule," then I, but apparently not the majority, believe the respected jurist was truly mistaken.

An illustration of this equal inference problem can be shown by the officer's arrest of Mares. Was the officer himself guilty of civil malfeasance? 1. ) His father (Officer William Tipps) asked him to make a pretext stop (so he did what his father

asked); 2.) Ordinarily he did not write tickets-wasn't even a traffic officer. (He violated his own principles for his father); 3.) He wrote two tickets for offenses that police and Houstonians commit every day, yet handcuffed, arrested and jailed Mares. Multiple squad cars and a canine "showed up" at the scene (this was no ordinary arrest and multiple officers knew in advance it would happen); 4.) The traffic tickets were dismissed (tickets are not ordinarily dismissed when an accused actually committed an offense). Is the drug enforcement officer arguably guilty of civil malfeasance of his office? Although a circumstantial case is there, I would answer no. No, because the logical inferences of possible malfeasance are equalized by the equally plausible inference he was honorably doing his duty. The majority, under its application of the law, would have to hold the officer was guilty of malfeasance.

I would, following *Wal–Mart, etc.,* observe the State's circumstantial hypothesis should be tested against the plausible legitimate possession of the money. *The State must show an illegitimate felony drug source of the money.* Inherent in the illegitimacy proof is the negating of legitimacy. For the source of the money cannot be both legitimate and illegitimate at the same time. Neither the government nor the majority explains away the $14,000 in U.S. Savings bonds. These bonds were in various dominations and in Mares' name. Do drug dealers exchange bonds with their names on them for cocaine? Yet all the circumstantial inferences should also tell us that the bonds were the result of a cocaine sale or prospective purchase. While possibilities abound, probabilities flounder. The State presented no evidence of a felony source of any of the

bonds or money. Assuming the laws of Texas afford an individual Texan the same protection as other defendants, then Mares' legal sufficiency challenge must be sustained

## Factual Sufficiency

The majority correctly recites the standard of review: We are to review all the evidence, not just evidence that supports the verdict. *Maritime,* 971 S.W.2d at 406–07. We set aside the verdict if it is so contrary to the overwhelming weight of evidence that it is clearly wrong and unjust; we do not assess credibility or substitute our judgment for the jury. *Id.* The key used to access the Mares' home was that of Ms. Jody French[12]. Ms. French resided with her young son at the residence on Malibu. Following the pretext stop, Ms. French's toddler was held by narc officers for over three hours. While holding her child, they obtained her consent to search the Malibu home. She correctly stated there were no drugs in the home.

The fact the Mares' Malibu house was watched for drug activity for six months without so much as a sniff, weighs heavily against the government. There is not a circumstantial inference but direct police observation negating drug dealing. The fact the government held Ms. French's 15–month–old child and threatened to turn the child over to CPS if she did not consent to a search, prompted an internal affairs investigation. This questionable holding of the toddler supports both positive and negative inferences, so I will draw none. No useable or marketable drugs were found in the truck or house. There were no drugs on the plastic jewelry bags, in the locked study, on the vitamins, anywhere but some

---

**12.** Notably, the "could have been a kilo" in the safe conjecture, could apply as well to Ms. French.

few contaminated bills. Mares gave plausible, typically probable, explanations of every circumstance advanced by the State. Mares was arrested near and on the way to his business where he used part of the cash in question. The dog alerted to clean money.[13] This is direct evidence that this dog alerts to clean money. The fact the dog did not alert where officers claimed they smelled marijuana and saw seeds directly questions their stated observations (although applying the equal inference rule, perhaps it was the dog whose nose was defective). The fact that no scientific evidence supports what officers claim they smelled and saw further erodes the stated opinions of certain officers.

It was undisputed Mares' father died and left an estate. Two witnesses and Mares testified Mares inherited and was paid family debts totaling more than $113,000 less than a year before. Mares sold a house and received further sums of cash. He ran two cash businesses, jewelry and auto repair. He just sold a motorcycle and was going to buy another, the stated source of the $1220.78 and $1304. In fact, his pretext stop was on the route and close to the jewelry business where he intended to go with his little boy. The government convinced the majority that a father going to work with his little boy and in possession of a Crown Royal bag of money, was instead (and more probably) going to do a drug deal. While there was some impeachment evidence of both the government and defense witnesses, the facts remained that Mares had at least as legitimate reasons for the cash as the government's suggested illegitimate inferences.

Finally, the fact that drug enforcement officers interception and arrest of Mares with his 15–month–old, both on a direct route to his work, and near his legitimate business, lead to the probable inference that his intent and purpose were legitimate, not illegitimate. Mares just came from his home where officers testified they saw no drug transactions. There was not even a speculative opinion drugs were sold from his business. How can any rational reviewer support the rank conjecture Mares was taking his child and money to a drug deal?

That the U.S. Bonds in the safe had his name on the various denominations, likewise support the probable inference they were possessed or to be used legitimately. The possible inferences supporting the government's contentions, are wholly insufficient to prove the requisite criminal animus.

If we are going to allow the government to hold our children, take our homes, our safes, use pretext stops and confiscate valuable items as proceeds of felony drug dealing, we must insist the State prove the valuables were not legitimately obtained. It is fundamental to our jurisprudence that government action be carefully and completely probed when it seizes a person or his property. The principle applies, *a fortiori*, when the government itself reaps a great financial benefit. Because of the constitutional implications in seizure and forfeiture cases of private property, the law should not apply the lowest level of circumstantial conjecture but rather adhere to *strictissimi juris*. "The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of this property, his liberty, or his life upon mere surmise or suspicion,

---

**13.** Given that a dog's nose is as much as 100 times more sensitive than a human and the almost universal contamination of U.S. currency, I surmise the dog was correct and the lab incorrect.

and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more." *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059, 1062 (1898)

I would sustain both the legal and factual sufficiency challenges. Today, surmise, conjecture and possibilities have been elevated to probability and proof. Property, liberty and life comprise today's casualties.