UNITED STATES of America

v.

Mamadou DIALLO, a/k/a Muhammed Diallo a/k/a Muhammad Diallo a/k/a Mohammed Diallo a/k/a Amadou Diallo, Appellant.

No. 07–3641.

United States Court of Appeals, Third Circuit.

Argued Oct. 23, 2008.

Filed: July 31, 2009.

Renee Pietropaolo (Argued), Office of Federal Public Defender, Pittsburgh, PA, for Appellant.

Robert L. Eberhardt, Laura S. Irwin (Argued), Office of the United States Attorney, Pittsburgh, PA, for Appellee.

Before: RENDELL and SMITH, Circuit Judges, and POLLAK, District Judge.[*]

## OPINION

SMITH, Circuit Judge.

A petit jury convicted Mamadou Diallo of intentionally trafficking in goods and knowingly using a counterfeit mark on or in connection with those goods in violation of 18 U.S.C. § 2320(a). The goods were handbags bearing a counterfeit "LV" logo. The counterfeit "LV" logo was substantially indistinguishable from the genuine "LV" logo owned by the Louis Vuitton Malletier Corporation, a designer of luxury handbags. Diallo contends that his conviction should be set aside because the evidence was insufficient in that it failed to establish his "use" of the counterfeit mark. Alternatively, Diallo asserts that his conviction should be vacated because the jury instruction defining the term "use" was incorrect. For reasons explained below, we will affirm.

## I.

On July 13, 2005, Pennsylvania State Trooper Timothy Callahan stopped Diallo's

[*] The Honorable Louis H. Pollak, Senior District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

van on Interstate–80 because the license plate was not illuminated. During the traffic stop, Trooper Callahan observed numerous sealed plastic bags in the van. After the traffic stop was concluded, Trooper Callahan explained to Diallo that he was free to go, but proceeded to mention that Interstate–80 is a corridor for the transportation of drugs from New York. He asked if Diallo had any drugs or firearms in the van. When Diallo denied possession of any such items, Trooper Callahan asked him what was contained in the plastic bags. Diallo replied that the bags contained clothes. When Trooper Callahan asked to see the clothes, Diallo opened the rear of the vehicle, pulled out a plastic bag, and opened it. What Trooper Callahan observed were numerous handbags bearing the "LV" mark. Knowing that Louis Vuitton handbags were an exclusive item sold only by Louis Vuitton stores, Trooper Callahan asked Diallo to whom the bags belonged. Diallo admitted they belonged to him and showed Trooper Callahan a business license from Indianapolis. Unimpressed, Trooper Callahan arrested Diallo.

A grand jury for the United States District Court for the Western District of Pennsylvania subsequently returned a one-count indictment against Diallo, charging him with violating 18 U.S.C. § 2320(a).[1] A jury trial commenced on April 10, 2006. The witnesses presented by the Government in its case in chief included Trooper Callahan, Diallo's passenger, Housseinou Diakhaby, expert witnesses who explained that the handbags were not genuine products of the Louis Vuitton Malletier Corporation, and a previous customer of Diallo's

Indianapolis store who related how she discovered that handbags she had purchased were not genuine Louis Vuitton handbags.

Diallo submitted his proposed jury instructions on the second day of trial. Relying upon the Supreme Court's decision in *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), and its interpretation of the word "uses" in 18 U.S.C. § 924(c), Diallo argued that the jury had to find beyond a reasonable doubt that he actively employed the counterfeit mark on or in connection with the handbags by displaying or offering them for sale. Consistent with this theory, Diallo moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. He claimed that because the handbags were sealed in bags in the back of his van they had not been displayed or offered for sale. The District Court reserved ruling on this motion.

During closing arguments, Diallo's counsel conceded that all but one of the elements of the offense were met—the element of "use." He argued that "use" required active employment of the mark by showing or displaying the goods bearing the counterfeit mark. On rebuttal, the government argued that "use begins when [Diallo] bought them in New York, carried them along the highway for purposes of using them at his commercial venture to sell." The prosecutor explained to the jury that Diallo "uses them when he buys them as inventory, as stuff he is going to take to his business in Indianapolis, [and] put up on all of those racks."

---

1. Although the "Stop Counterfeiting in Manufactured Goods Act" amended paragraph (a) of § 2320 in March of 2006 to address the growth of counterfeiting in component parts, Pub.L. No. 109–181, 120 Stat. 285 (March 16, 2006), we are concerned here with the statute in effect when Diallo was arrested in 2005. At that time, § 2320(a) made it a crime to "intentionally traffic[] ... in goods or services and knowingly use[] a counterfeit mark on or in connection with such goods or services...." 18 U.S.C. § 2320(a) (2005).

The Court instructed that the government had to prove beyond a reasonable doubt:

First, that the defendant trafficked or attempted to traffic in goods.

Second, that such trafficking or attempt to traffic was intentional.

Third, that the defendant used a counterfeit mark on or in connection with the goods.

And fourth, that the defendant knew the marks used on the goods were counterfeit.

The Court defined "traffics" and "counterfeit mark" in accordance with their statutory definitions. Because the statute does not define "use," however, the jury instructions did not elaborate on the meaning of that term. During its deliberations, the jury submitted a question to the Court:

What is the definition of "use" as it pertains to this trial ... [and] the 3rd [and] 4th elements of the charge? Is it pertaining to a *physical* exchange or use of one or more senses?

The District Court excused the jury for the night, and the following morning provided counsel an opportunity to respond to the question. Defense counsel, again relying on the Supreme Court's decision in *Bailey,* urged that the instruction should "say affirmative acquisition is not enough to prove that the defendant used a mark on or in connection with the goods, that possession is not enough, that possession with intent to sell is not enough, and that trafficking, as defined by statute, is not enough to prove use...."

After considering counsel's arguments, the District Court distinguished the Su-

preme Court's decision in *Bailey* and declared that

the prudent course is to provide the jury with a dictionary definition of the word "use" both from *Black's Law Dictionary* and the *Webster's Third New International Dictionary,* Unabridged Version, and the Court will reduce that instruction into writing and make it part of the record....

The instruction to the jury stated that the "Definition of the word 'use' " is "[t]o make use of, to put into action or convert to one's service, to avail oneself of, to have recourse to or enjoyment of, to employ." Defense counsel objected to the portion of the definition that said "to have recourse to or enjoyment of." Following this instruction, the jury deliberated briefly before finding Diallo guilty of violating 18 U.S.C. § 2320(a). Post-verdict, Diallo renewed his Rule 29 motion for judgment of acquittal, challenging the sufficiency of the evidence for the element of use.[2]

The District Court denied Diallo's renewed Rule 29 motion. It determined that there was sufficient evidence that Diallo used the counterfeit mark on or in connection with goods, stating that:

Diallo's knowing, intentional acquisition of handbags emblazoned with spurious marks for sale at a profit at his store was more than sufficient evidence to prove that he had "used" counterfeit marks because he "avail[ed][him]self of [or] ha[d] recourse to or enjoyment of them" on or in connection with goods or services for which the genuine marks are actually registered.

---

**2.** After the jury was discharged, the jury foreman revealed to the bailiff that he had used a computerized device to access a dictionary database to look up the definition of the word "use." The District Court brought this impropriety to the attention of counsel and ad-

vised them that he would call the jury back to conduct voir dire. Diallo's counsel did not raise juror misconduct as a ground for new trial. Diallo's only post-verdict motion was the renewed Rule 29 motion.

Thereafter, the District Court sentenced Diallo to probation for a term of three years, with a six month term of electronically monitored home detention. In addition, Diallo was directed to pay restitution of $2,600.00 to the Louis Vuitton Malletier Corporation.

This appeal followed. Diallo contends that the District Court erred in denying the Rule 29 motion because the evidence was insufficient to establish the "use" required by 18 U.S.C. 2320(a). In addition, Diallo contends that the Court's instruction on the element of "use" was error because it deprived Diallo of his theory of the defense that his constructive possession of the handbags contained in sealed bags within his van did not constitute a use of the counterfeit mark on or in connection with the handbags.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise final order jurisdiction under 28 U.S.C. § 1291.

"We exercise plenary review to determine whether jury instructions misstated the applicable law, but in the absence of a misstatement we review for an abuse of discretion." *United States v. Hoffecker*, 530 F.3d 137, 173–74 (3d Cir.2008) (citation omitted). In conducting our review, our focus should be on "the totality of the instructions and not a particular sentence or paragraph in isolation." *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir.1995).

■ We "review the sufficiency of the evidence 'in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 346 F.3d at 470 n. 1 (internal citations omitted). Our review of the District Court's con-

struction of the element of "use" is plenary. *Id.*

## III.

■ Diallo's claim that the jury instruction was erroneous and his contention that there was insufficient evidence both concern the statutory interpretation of the term "uses" in § 2320(a). "The role of the courts in interpreting a statute is to give effect to Congress's intent.... Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir.2001) (citations omitted). Section 2320(a) makes it a crime to "intentionally traffic[ ] ... in goods or services *and* knowingly use[ ] a counterfeit mark on or in connection with such goods or services...." 18 U.S.C. § 2320(a) (emphasis added). The plain language of the statute, therefore, requires that the Government prove not simply that a defendant has knowingly "used" a counterfeit mark or in connection with a good or service, but also that the defendant intentionally trafficked in the goods or services. Thus, the Government must demonstrate both trafficking in goods and "use" of the counterfeit mark on or in connection with goods. *United States v. Giles*, 213 F.3d 1247, 1249 (10th Cir.2000); *see also United States v. Song*, 934 F.2d 105, 108–09 (7th Cir.1991) (pointing out that "[t]he use of the conjunctive 'and' preceding the term 'counterfeit mark' indicates congressional intent to prosecute one who traffics in goods *and* who uses a counterfeit mark in connection with those goods"). "Use" for purposes of § 2320(a), however, is not defined by the statute. In the absence of a statutory definition, we give "the words used their ordinary meaning." *Moskal v. United*

*States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)) (internal quotation marks omitted).

■ According to Diallo, his conviction must be overturned because the District Court erred in its interpretation of the term "uses" in § 2320 because it failed to heed the guidance of the Supreme Court in *Bailey v. United States*, that " 'use' must connote more than mere possession" and "that the Government must show active employment of the firearm." 516 U.S. at 143, 144, 116 S.Ct. 501. In *Bailey*, the Supreme Court considered the meaning of the term "uses" in 18 U.S.C. § 924(c), which sets forth certain penalties for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm. . . ." *Id.* at 138, 116 S.Ct. 501. The Court observed that the term " '[u]se' draws meaning from its context," and it "look[ed] not only to the word itself, but also to the statute and the sentencing scheme, to determine the meaning Congress intended." *Id.* at 143, 116 S.Ct. 501. In addition, the Court instructed that:

> We start, as we must, with the language of the statute. The word "use" in the statute must be given its "ordinary or natural" meaning, a meaning variously defined as "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." . . . We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. The meaning of statutory language, plain or not, depends on context. . . .

*Id.* at 144–45, 116 S.Ct. 501 (internal quotations marks and citations omitted). Consistent with these instructions, the Court noted that the "various definitions of 'use'

imply action and implementation," *id.* at 145, 116 S.Ct. 501, and pointed out that the statute applied to "two types of conduct with a firearm: 'uses' or 'carries,' " *id.* Mindful that "Congress intended each of [the statutes's] terms to have meaning" and that judges should hesitate to treat as surplusage any statutory terms, *id.* at 145, 116 S.Ct. 501, the Court reasoned:

> We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning. While a broad reading of "use" undermines virtually any function for "carry," a more limited, active interpretation of "use" preserves a meaningful role for "carries" as an alternative basis for a charge.

*Id.* at 146, 116 S.Ct. 501. It rejected the interpretation that "use" was synonymous with "possession" and determined that the term "uses" meant that "Congress intended 'uses' in the active sense of 'to avail oneself of.' " *Id.* at 150, 116 S.Ct. 501. The Court acknowledged that this "active-employment understanding of 'use' " included "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire a firearm[,]" as well as the offender's reference to the fact that he possesses a firearm. *Id.* at 148, 116 S.Ct. 501. Although this reading of the term "use" was restrictive, the Bailey Court concluded that it was consistent with both the context of the term and Congress' intent. *Id.* at 150, 116 S.Ct. 501.

The Supreme Court revisited the meaning of "use" in § 924(c) in *Watson v. United States*, 552 U.S. 74, 128 S.Ct. 579, 169 L.Ed.2d 472 (2007), which considered whether a defendant's swap of his drugs for a firearm constituted "use" of the firearm "during and in relation to any . . . drug trafficking crime[.]" *Id.* at 581 (quoting 18 U.S.C. § 924(c)). Again the Court noted that in the absence of a statutory

definition or a "definitive clue, the meaning of the verb 'uses' has to turn on the language as we normally speak it." *Id.* at 583. The Court "looked for 'everyday meaning' . . . revealed in phraseology that strikes the ear as 'both reasonable and normal.'" *Id.* (quoting *Smith v. United States,* 508 U.S. 223, 228, 230, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). The Court agreed with the defendant that the "ordinary meaning and the conventions of English" meant a person did not use a firearm when he received it in exchange for drugs. *Id.* at 586.

Diallo cites to *Watson* as support for his contention that the District Court erred in defining "use." Focusing on the prosecution's closing argument that Diallo's use began when he purchased "them as inventory," Diallo argues that *Watson* illustrates that his mere receipt in trade of the handbags is insufficient to establish "use" of the counterfeit mark in connection with the goods. Diallo's argument is flawed. It assumes that the critical moment for purposes of this prosecution was the commercial transaction in New York when he purchased the handbags. The focus of this prosecution, however, was on what Diallo did with the handbags bearing the counterfeit Louis Vuitton mark after he purchased them. In other words, Diallo's purchase is relevant only to the extent that at that point in time he acquired ownership and control over the handbags.

Relying on *Bailey*'s interpretation of the word "uses" in § 924(c), Diallo asserts that "uses" in § 2320(a) requires active employment of the counterfeit mark by displaying or offering the handbag for sale. In *United States ex rel. Chicago, New York & Boston Refrigerator Co. v. Interstate Com-merce Commission,* 265 U.S. 292, 295, 44 S.Ct. 558, 68 L.Ed. 1024 (1924), the Supreme Court acknowledged that "because words used in one statute have a particular meaning they do not necessarily denote an identical meaning . . . in another and different statute." In the context of § 2320(a), the "use" is of the counterfeit marks. As the District Court pointed out, there is little similarity between the "use" of counterfeit marks as contemplated by § 2320(a) and the "use" of firearms pursuant to § 924(c). The very nature of a firearm makes the concept of its "use" as "active employment" readily understandable. The "use" of a mark in connection with goods does not. Thus, while *Bailey*'s interpretation of the word "uses" may be informative, it is in no way controlling in the context of § 2320(a).

Although we find that factual distinctions render *Bailey* and *Watson* inapposite to our inquiry, we follow *Bailey*'s regimen for statutory interpretation and begin with the language of the statute. *Bailey,* 516 U.S. at 144, 116 S.Ct. 501. Section 2320(a) provides that "whoever intentionally traffics . . . in goods or services, and knowingly uses a counterfeit mark on or in connection with such goods or services" commits a crime. 18 U.S.C. § 2320(a). The statutory definition of the term "traffic" is broad, meaning "transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent so to transport, transfer, or dispose of . . . ." 18 U.S.C. § 2320(e)(2). "Uses," however, is not defined by the statute. The term appears in the statutory definition of "counterfeit mark,"[3] and each time "use" appears it is

---

**3.** Paragraph (e)(1) of § 2320 provides:

[T]he term "counterfeit mark" means—
(A) a spurious mark—

(I) that is *used* in connection with trafficking in goods or services;
(ii) that is identical with, or substantially indistinguishable from, a mark registered

in conjunction with a reference to either a spurious mark or a genuine mark registered with the United States Patent and Trademark Office.

On its face, the statute "refers to trafficking in 'goods,' and using the counterfeit mark 'on or in connection with such goods.'" *Giles*, 213 F.3d at 1249. The Government must prove two distinct actions: trafficking in goods and using the counterfeit mark on or in connection with goods. The definition section of the statute reiterates that the act of trafficking pertains to the goods or services, and that the act of using relates to the counterfeit mark. The use is of the counterfeit mark, not the goods. This distinction is reinforced by the fact that the phrase "use of the counterfeit mark" must be "on or in connection with such goods." Indeed, in *Giles*, the Tenth Circuit emphasized that criminal liability under § 2320(a) would lie only if the "use" of the counterfeit mark was in connection with the goods being trafficked. That Court concluded that "the mere act of trafficking in [patch sets or] counterfeit labels which are unconnected to any goods" did not violate the statute that was in effect in 1994. 213 F.3d at 1251.

Therefore, unlike § 924(c) in *Bailey* which proscribes more than one type of conduct involving a firearm, *i.e.*, the using or carrying of a firearm under certain circumstances, 516 U.S. at 145, 116 S.Ct. 501, § 2320 does not present a statutory scheme proscribing multiple types of conduct involving the same object. Rather, § 2320 addresses only one type of conduct involving the counterfeit mark, *i.e.*, the use of it in connection with a good. It is unnecessary, therefore, to restrict the meaning of the expansive term "uses" in § 2320 as occurred in *Bailey*. *See Bailey*, 516 U.S. at 146, 116 S.Ct. 501; *see also Smith*, 508 U.S. at 229, 113 S.Ct. 2050 (noting that "§ 924(c)(1)'s language sweeps broadly," and is "expansive"), and *id.* at 241, 113 S.Ct. 2050 (Scalia, J., dissenting) (characterizing "use" as "elastic").

Were we to adopt the meaning for the term "uses" urged by Diallo, which focuses on displaying and offering the goods bearing the spurious marks for sale, we would be rewriting the text of the statute from "uses the counterfeit mark on or in connection with such goods" to "uses the counterfeit mark on or in connection with such goods in a sales transaction." Yet, neither the words "sale" nor "sell" appears in § 2320. Instead, the statute more broadly references a commercial component by incorporating the word "traffics," and without limiting that term to the point of sale. *See* 18 U.S.C. § 2320(e)(2) (defining "traffics"). Because the Supreme Court has instructed that "[o]n matters of statutory interpretation, '[o]ur task is to apply the text, not to improve on it[,]'" *Bd. of Educ. of Westside Cmty, Schools v. Mergens By and Through Mergens*, 496 U.S. 226, 241, 110 S.Ct. 2356, 110 L.Ed.2d

for those goods or services on the principal register in the United States Patent and Trademark Office and in *use,* whether or not the defendant knew such mark was so registered; and

(iii) the *use* of which is likely to cause confusion, to cause mistake, to deceive; or

\* \* \*

but such term does not include any mark or designation *used* in connection with goods or services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to *use* the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to *use* such mark or designation.

18 U.S.C. § 2320(e)(1) (emphases added).

191 (1990) (*quoting Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989)), we decline to read into § 2320(a) a requirement that "use," by itself, requires either a potential, or an actual, sales transaction.

In our view, an ordinary and natural reading of "uses" gives effect to Congress's intent "to control and prevent commercial counterfeiting" by reaching a stream of illegal commerce and not simply its point of sale. *See* Pub.L. No. 104–153, 110 Stat. 1386 (July 2, 1996) (specifying in its Anticounterfeiting Consumer Protection Act of 1996 the purpose of the Act). Regardless of whether the goods bearing the counterfeit marks are physically located in a kiosk at a shopping mall or in a remote warehouse, the trafficker may still be prosecuted if he knowingly uses the mark on or in connection with a good. Diallo's reading, however, would limit enforcement to prosecuting vendors who have the counterfeit goods displayed and ready for sale.

We find support for this reading of the term "uses" in § 2320(a) in *United States v. Farmer*, 370 F.3d 435 (4th Cir.2004), and *United States v. Song*, 934 F.2d at 106. In each case, the defendant's conviction for violating § 2320(a) was affirmed even though the goods bearing the counterfeit marks were neither displayed for sale nor physically located at a store or shop. For example, in *Farmer*, the Fourth Circuit upheld the defendant's conviction under § 2320(a) based on his warehousing of thousands of shirts bearing counterfeit brand name logos of Nike and Adidas. 370 F.3d at 437. In *Song*, the Seventh Circuit affirmed Song's conviction on five counts of trafficking in counterfeit goods based on not only her displaying counterfeit Gucci watches at her flea market stand, but also because she had watches bearing four other counterfeit marks stored in her van.

We conclude, based on the statutory text of § 2320(a), that we need not restrict the expansive statutory term "uses" as Diallo suggests. Accordingly, because the commercial aspect of a defendant's conduct is encompassed in the element of trafficking, we reject Diallo's argument that the term "uses" in § 2320(a) means that the government must show active employment of the counterfeit mark at a point of sale.

■ Having concluded that an ordinary and natural reading of "uses" is appropriate in the context of § 2320, we consider the definition crafted by the District Court in response to the jury's inquiry. Because Diallo contends the instruction was legally incorrect, we exercise plenary review. *United States v. Zehrbach*, 47 F.3d 1252, 1260 (3d Cir.1995). In conducting our review, we must be mindful "that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). In reviewing the charge as a whole, we consider whether the instruction regarding the meaning of "use" "strikes the ear as 'both reasonable and normal'" as required by *Watson*, 128 S.Ct. at 583.

Consistent with the *Bailey* Court's consultation of dictionaries, 516 U.S. at 145, 116 S.Ct. 501, the District Court considered definitions from *Black's Law Dictionary* 1382 (5th ed.1979), and *Webster's Third New International Dictionary* 2523 (3d ed.1993). *Black's Law Dictionary* defines the term as "[t]o put or bring into action or service; to employ for or apply to a given purpose." *Id.* at 1382. The *Black's* definition further explicates the term in a "[n]on-technical sense," such that "[t]he 'use' of a thing means that one is to enjoy, hold, occupy, or have some manner

of benefit thereof." *Id.* Among the numerous entries explaining the word "use" in *Webster's Third New International Dictionary* is the definition: "to put into action or service; have recourse to or enjoyment of; Employ." *Id.* at 2523. Based on these definitions, the District Court combined the two dictionary definitions to fashion the definition it provided to the jury: "To make use of, to put into action or convert to one's service, to avail oneself of, to have recourse to or enjoyment of, to employ."

Diallo takes issue only with the language "to have recourse to or enjoyment of," which were not part of the definition of "use" considered by the *Bailey* Court. 516 U.S. at 145, 116 S.Ct. 501. In his view, this language renders the definition "overly broad and beyond any ordinary use of the word," as it allowed the jury to find him guilty of the offense based on his constructive possession of the goods bearing the counterfeit mark. As noted, *Watson* instructs that we should consider whether the definition used by the District Court "strike[s] the ear as reasonable and normal." 128 S.Ct. at 583 (internal quotation marks and citation omitted). In our view, the definition crafted by the District Court from *Black's Law Dictionary* and *Webster's Third New International Dictionary* is "reasonable and normal" in describing the use of trademarks, a form of intellectual property.

The intended purpose of a trademark, be it genuine or spurious, is to convey that the good meets the design and manufacturing specifications of the lawful owner of the trademark, not only at the time the mark is first affixed or attached to the good, but throughout the lifetime of that good. *See* 15 U.S.C. § 1127 (defining "trademark" and specifying that it is "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others....").

This purpose informs our analysis. Here, the counterfeit "LV" logo was used on or in connection with a good by being affixed to it, *i.e.*, by being attached to a handbag. The "LV" logos were converted to Diallo's service, and employed by being attached, sewn, embossed, imprinted or connected to the handbags in order to distinguish them as genuine Louis Vuitton merchandise. The merchandise in the back of the van that Diallo had recourse to and could avail himself of was not simply handbags, but handbags bearing the exclusive Louis Vuitton "LV" logo. As a result, even though these handbags bearing the counterfeit "LV" logos were not yet in Diallo's Indianapolis store, they were a part of his inventory. Diallo's ownership of the handbags bearing the "LV" logos enabled him to represent to others—falsely—that he owned genuine Louis Vuitton handbags. Diallo was able to enjoy having an inventory that contained seemingly authentic Louis Vuitton handbags, knowing that they would command a greater purchase price than a bag not bearing the counterfeit mark.

These explanations, which each draw on the definition provided to the jury in Diallo's case, are consistent with the natural and ordinary meaning of the term "use" as it pertains to trademarks. Accordingly, we can find no error in the District Court's definition of "use" and we conclude that the jury charge, taken as a whole, accurately submitted the issues to the jury. The District Court's refusal to delete the language "recourse to and enjoyment of" in its definition of the term "use" did not constitute an abuse of discretion.

■ With the District Court's definition of "use" in mind, we turn to whether there was sufficient evidence of Diallo's "use" of the counterfeit marks on or in connection with the goods to sustain his conviction. As explained above, the evidence was suffi-

cient for a jury to conclude that Diallo "used" the counterfeit "LV" logos on or in connection with the handbags. As Trooper Callahan testified at trial, Diallo admitted that the handbags, which bore the counterfeit "LV" logos, were for his store in Indianapolis. Though packaged in plastic bags during transit, the marked handbags were part of Diallo's inventory and he was able to enjoy the benefits of the counterfeit "LV" marks that were on the handbags. This was sufficient for a jury to find the element of "use" for purposes of § 2320(a).

For the reasons set forth above, we will affirm the judgment of the District Court.

POLLAK, District Judge, concurring.

I concur in the court's judgment, but I get there via a somewhat different route. I agree with the court's construction of the governing statute. My concern has to do with what the jury was instructed by way of definition of the statute. The court approves the District Court's definition of the verb "use," as contained in a supplemental jury instruction (an instruction to which Diallo took exception in part) responsive to the jury's question as to the intended meaning of "use." In my view, the definition contained in the supplemental instruction was, in one respect, flawed. But I conclude that the error was harmless, and hence I agree with the court that Diallo's conviction and sentence should be affirmed.

I.

As the court's opinion makes clear, defendant Mamadou Diallo's troubles began

when, on July 13, 2005, while Diallo was driving from New York to Indianapolis on Interstate–80, his forward progress was halted by Pennsylvania State Trooper Timothy Callahan, who perceived that Diallo's van did not appear to be in conformity with the law's requirement that a license plate be illuminated. Callahan, apparently concerned about the possible transport of drugs and firearms, inquired what was in the several plastic bags in Diallo's van. Diallo, after explaining that the bags contained clothes, at Callahan's request (but, apparently, not command) opened one of the bags, which turned out not to contain clothes but handbags bearing the initials "LV," the mark of expensive Louis Vuitton products. Diallo was then arrested by Callahan. Not long after, Diallo was indicted on one count of violating 18 U.S.C. Section 2320(a). § 2320(a) made it a crime punishable by fine and imprisonment to "intentionally traffic [ ] or attempt [ ] to traffic in goods or services and knowingly use [ ] a counterfeit mark in connection with such goods or services." [4] Tried to a jury, Diallo was found guilty. He was sentenced to three years of probation, six months of which was to consist of home detention.

The evidence at trial established that Diallo had purchased the counterfeit Louis Vuitton handbags in New York and was, when arrested, en route to Indianapolis to sell the handbags at his retail store.

As the court explains, the District Court, in charging the jury, outlined, concisely and with precision, the elements of the offense which it was incumbent upon the government to prove:

> counterfeit mark in connection with such goods or services," but (2) then goes on to list at considerable length a variety of goods the specification of which suggests that they are legislatively perceived as goods that are particularly likely to be targets of counterfeiters.

**4.** Diallo was convicted pursuant to § 2320(a) as it stood in 2005. In 2006 Congress amended § 2320(a); the amended statute (1) follows its predecessor in making it a crime to "intentionally traffic[] or attempt [] to traffic in goods or services and knowingly use [] a

First, that the defendant trafficked or attempted to traffic in goods. Second, that such trafficking or attempt to traffic was intentional. Third, that the defendant used a counterfeit mark on or in connection with the goods. And fourth, that the defendant knew the marks used on the goods were counterfeit.

However, prior to the jury charge, the government's burden of proof had been lessened by defendant's acknowledgment, in closing argument, that the single issue in dispute was whether Diallo, as of the time of his arrest, had, within the intendment of the statute, "use[d]" the counterfeit marks. Diallo's position was that there could have been no use, within the terms of § 2320(a), until counterfeit goods were offered for sale. In opposition, the government contended that culpable "use" commenced when the counterfeit handbags were purchased in New York with a view to subsequent sale. Unsurprisingly, the jury, shortly after it started deliberating, posed a question:

> What is the definition of "use" as it pertains to this trial between the dates of July 11, 2005 and July 13, 2005, and the third and fourth elements of the charge? Is it pertaining to a *physical* exchange or use of one or more senses.

After substantial consultation with counsel, the District Court undertook to answer the jury's question the next day. Weaving together two dictionary definitions, the District Court explained "use" as follows:

> To make use of, to put into action or convert to one's service, to avail oneself of, to have recourse to or enjoyment of, to employ.

Defendant objected to inclusion of the phrase "to have recourse to or enjoyment of." Defendant's objection to "have recourse to" is, in my judgment, without merit. But his objection to "have ...

enjoyment of" is, in my judgment, soundly based.

"[T]he meaning of the verb 'uses' has to turn on the language as we normally speak it." *Watson v. United States*, 552 U.S. 74, 128 S.Ct. 579, 583, 169 L.Ed.2d 472 (2007). In my view, "put into action," "convert to one's service," "avail oneself of," "have recourse to," and "employ," satisfy this standard. "[H]ave ... enjoyment of" does not.

It is true that *Webster's Third New International Dictionary* 754 (3d ed.1993) includes, in the definition of "enjoyment," the phrase "possession and use (the [enjoyment] of civil rights)." But this is a secondary meaning. What *Webster's* lists as the primary meaning of "enjoyment" is (unsurprisingly) "the action or state of enjoying something: the deriving of pleasure or satisfaction (as in the possession of anything)." This primary meaning is "language as we normally speak it." *Watson, supra*, 128 S.Ct. at 583. Presenting to a jury the phrase "have ... enjoyment of" as a synonym of "use," without explaining that the phrase is being employed in its secondary meaning—without, in short, anchoring the phrase in a limiting and clarifying context—has the potential to mislead.

My concern about the ambiguity of "have ... enjoyment of," unilluminated by instructive context, may be illustrated by an example, drawn on the verb "enjoy." One may say: "The lieutenant governor enjoys presiding over the state senate." One may also say: "The lieutenant governor enjoys qualified immunity." These two sentences mean very different things. But the different meanings are signaled by the different settings in which the verb "enjoys" appears. When the phrase "have ... enjoyment of" is employed without adornment or elaboration it seems a reasonable surmise that the attentive audience will suppose "have ... enjoyment of"

carries its primary meaning, for that is "language as we normally speak it."

This is why the inclusion of the phrase "have ... enjoyment of" in the supplementary language supplied to the jury seems to me to have been more likely to confuse than to illuminate. Accordingly, when defendant objected to the phrase it should have been excised.

## II.

Under the caption "Harmless Error," Rule 52(a) of the Federal Rules of Criminal Procedure provides:

> Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

A decade ago Chief Justice Rehnquist, speaking for the Court, observed that, "Although this Rule by its terms applies to *all* errors where a proper objection is made at trial, we have recognized a limited class of fundamental constitutional errors that 'defy analysis by harmless error standards.' ... Errors of this type are so intrinsically harmful as to require automatic reversal (*i.e.,* 'affect substantial rights') without regard to their effect on the outcome. For all other constitutional errors, reviewing courts must apply Rule 52(a)'s harmless-error analysis and must 'disregar[d]' errors that are 'harmless beyond a reasonable doubt'." *Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). However, appellate review of *non*-constitutional errors does not call for beyond-a-reasonable-doubt scrutiny. "According to our traditional harm-

less error standard, a non-constitutional error is harmless when 'it is highly probable that the error did not prejudice the defendant'." *United States v. Langford,* 516 F.3d 205, 215 (3d Cir.2008).[5]

I have argued above that it was error for the District Court, in responding to the jury's request for clarification as to the meaning of the verb "use," to have included among several defining verbal phrases the phrase "have ... enjoyment of." If this was error, it was of course non-constitutional error. Is it " 'highly probable that the error did not prejudice' the defendant"? Manifestly, the answer is "Yes." If the phrase be deemed to have carried any weight, it could only have worked in Diallo's favor. The reason for positing that the phrase might have caused some confusion in a juror's mind is that, given the primary meaning of "enjoyment," a juror might conceivably have supposed that it was incumbent on the government to show that Diallo had been gratified by—*i.e.,* had taken pleasure in—the counterfeit marks, and that in the absence of such a showing the government had not proved its case. Thus, what I believe to have been error was most assuredly harmless. And I therefor concur in the judgment of the court affirming the judgment of the District Court.

5. *Langford* draws on *Government of Virgin Islands v. Toto,* 529 F.2d 278 (3d Cir.1976), decided more than thirty years ago. The opinion of Judge Aldisert, joined by Judges Weis and Garth, is notable in that it builds upon, and expressly pays tribute to, the harmless-error analysis propounded by Roger J. Traynor, one of the most revered and influential state-court judges of the twentieth century. As Judge Aldisert put it: "Roger J. Traynor, the distinguished former Chief Justice of California, offers the wisdom of profound experience in approaching the basic problem from the viewpoint of harmless error." *Id.* at 284.