**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3217
_____

GOVERNMENT OF THE VIRGIN ISLANDS

v.

RENELL A. LETTSOME,
Appellant
_____

On Appeal from the
District Court of the Virgin Islands
Division of St. Thomas and St. John
Appellate Division
(D.V.I. No. 3-06-cr-00068-001)
(District Judges: Honorable Harold W. Willocks; Honorable Raymond L. Finch;
Honorable Curtis V. Gómez)
_____

Argued May 17, 2016
_____

Before: FUENTES,[*] VANASKIE, and RESTREPO, *Circuit Judges*.

(Opinion Filed: March 2, 2017)

Namosha Boykin          [ARGUED]
Law Offices of Pedro K. Williams
5212 Wimmelskafts Gade
Suite 200
St. Thomas, VI 00802
        *Counsel on behalf of Appellant*

_____

[*] The Honorable Julio M. Fuentes assumed senior status on July 18, 2016.

Kimberly L. Salisbury    [ARGUED]
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802
     *Counsel on behalf of Appellee*

_____

OPINION**

_____


VANASKIE, *Circuit Judge.*

Following a jury trial in the Superior Court of the Virgin Islands, a jury convicted

Appellant Renell Lettsome on charges of second degree murder, attempted second degree

murder, assault, and arson.  The jury also found him guilty on separate charges for the

use of a dangerous weapon during the commission of these crimes.  The District Court of

the Virgin Islands, Division of St. Thomas and St. John, Appellate Division (the

"Appellate Division"), affirmed Lettsome's convictions, with the exception of the

conviction for use of a dangerous weapon during the commission of arson.  The

Appellate Division also affirmed the Superior Court's sentence, which aggregated 57 ½

---

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

years in prison and more than \$35,000 in fines, plus restitution.[1]  Lettsome now appeals the Appellate Division's decision.[2]  For the reasons that follow, we will affirm.

I.

The facts of this matter are recounted in great detail in the Appellate Division's per curiam opinion of August 21, 2015, and will only be briefly restated here.  On October 29, 2005, David Geiger and his teenage son, Nathan, were attacked in their home in St. John, the United States Virgin Islands ("USVI"), after which their home was set on fire.  David was killed during the attack, and Nathan sustained serious injuries.

Several days before the brutal murder, David Geiger discovered that \$50,000 had been stolen from his house while Amber Taylor was house-sitting for him.  David had confronted Taylor, who denied any involvement in the theft.

Two days after the murder, the Virgin Islands Police Departure ("VIPD") interviewed Taylor.  She denied any involvement in either the theft or the murder.  On November 11, 2005, Taylor changed her story.  She told the VIPD that a man named Tulius Stewart over-powered her while she was house-sitting the Geiger residence and stole the money.  She also told law enforcement that it was Lettsome, with whom she had a child, who had killed David Geiger.  Lettsome was upset that David Geiger was

---

[1] The overall length of Lettsome's prison term was unaffected by the reversal of the conviction for the use of a dangerous weapon during the commission of arson.

[2] Jurisdiction to hear Lettsome's appeal was conferred on the Appellate Division pursuant to 48 U.S.C. § 1613a(a) & (b).  We have jurisdiction to review the Appellate Division's decision pursuant to 48 U.S.C. § 1613a(c).

3

harassing Taylor about the theft, and wanted to stop the harassment. [3]  Based upon

Taylor's statements, the VIPD caused a warrant to be issued for the arrest of Lettsome.

On November 27, 2005, Lettsome walked into a police station in the British

Virgin Islands ("BVI").  He was arrested on suspicion of illegal entry into the BVI.  After

receiving a "Caution Statement" from a BVI detective and acknowledging his

understanding of that statement,[4] Lettsome proceeded to confess to the murder of David

Geiger, the assault on Nathan, and the attempt to burn down the Geiger house.  Shortly

after confessing to the BVI detective, Lettsome was *Mirandized* by officers from the

VIPD.  In great detail, Lettsome recounted his attack on the Geigers.  He related that he

had waited outside the Geiger home until David went to sleep, then attacked him in his

bedroom with a metal pipe and knife.  In an attempt to fend off the attack, David bit

Lettsome's hand.  Evidently awakened by the altercation, Nathan entered his father's

bedroom.  Lettsome turned his attention to Nathan, pushing him into the kitchen and

beating him with the pipe until he was unconscious.  Lettsome then dragged Nathan into

the living room.  After moving Nathan to the living room, Lettsome drank from a gallon

jug of water.  While attempting to clean up the mess that had been made, Lettsome heard

David groan.  He returned to David's bedroom, where he beat him with the pipe until

David was dead.  Then, in an attempt to conceal his crimes, Lettsome obtained some

---

[3] As recounted by the Appellate Division, "[s]ometime after Taylor made her statement
the People assisted Taylor in relocating to Florida, on the ground that her safety was at
risk . . . ."  (App. at 10.)

[4] The Caution Statement is similar in some respects to the *Miranda* warnings required in
the United States.

4

torch fluid from a nearby golf course, covered David's body with a mattress, and set fire to the house. After he left the house, Lettsome honked his car horn to warn neighboring tenants of the fire. Although the nearby tenants were able to save Nathan from the fire, they could not rescue David.

After Lettsome's confession, the VIPD officers transported him back to the USVI. A twelve count information was returned against Lettsome. Count One accused Lettsome of first degree murder, and Count Two charged use of a dangerous weapon during the commission of first degree murder. Counts Three and Four charged second degree murder and use of a dangerous weapon in the commission of second degree murder. Counts Five through Ten concerned the assault on Nathan with a dangerous weapon. Finally, Counts Eleven and Twelve charged first degree arson and the use of a deadly weapon during the commission of arson.

At a pretrial conference held on March 24, 2006, the government informed the Court and defense counsel that they were awaiting results of a DNA examination of various pieces of evidence retrieved from the crime scene, including the water jug found at the Geiger residence. In an order entered on May 25, 2006, the trial court scheduled a final pretrial conference for August 2, 2006, with jury selection set for August 4 and trial set for August 7, 2006. On July 24, 2006, just two weeks before trial was set to begin, the prosecution filed a summary of the anticipated testimony of its DNA expert. The summary indicated that blood found at the crime scene, including blood found on the water jug, contained DNA that matched Lettsome's DNA. On July 31, 2006, Lettsome

5

moved for permission to retain a DNA expert and to continue the trial. The trial court granted permission to retain an expert, but refused to continue the trial.

On the morning of jury selection, the trial court raised a concern with respect to the adequacy of those counts in the Information charging use of a dangerous weapon during the commission of the underlying crimes. Although the Information correctly cited the section of the crimes code making it unlawful to use a dangerous weapon in the commission of a crime of violence, the Information itself failed to specifically allege use of dangerous weapon during the commission of a crime of violence or that the conduct alleged was unlawful. The prosecution promptly moved to amend the information to correct the defects. Over the defense objection, the trial court granted the motion on the first day of trial.

Also prior to trial, the trial court learned that the prosecution was responsible for Amber Taylor's relocation to Florida and for Lettsome's unsuccessful attempt to have her testify on his behalf. The trial court, concluding that the prosecution had engaged in misconduct in causing Taylor's absence, permitted Lettsome's counsel to craft a written narrative of the testimony he expected Taylor to provide. This narrative portrayed Lettsome as a peaceful person and an excellent father. The narrative related that she had told the police on November 11, 2005 that Lettsome was the murderer "so that [the police] w[ould] stop harassing and threatening [her] and because that is what [she and] Renell . . . had agreed to." (App. 1017.) The narrative was read to the jury as Lettsome's final piece of evidence. In rebuttal, the prosecution presented the testimony of the VIPD police officer who had interviewed Amber Taylor on October 31 and November 11,

6

2005. The jury was also presented with Taylor's October 31 and November 11, 2005 statements to the police.

As noted above, the jury returned a verdict of guilty on all charges with the exception of the first degree murder charge and the related charge of use of a dangerous weapon during the commission of first degree murder. The Appellate Division affirmed the jury verdict with the exception of the charge of use of a dangerous weapon during the commission of arson. This timely appeal followed.

II.

Lettsome presents five arguments on appeal. First, Lettsome contends that the Appellate Division erred in subjecting to harmless error review the Superior Court's erroneous admission of Amber Taylor's statements to law enforcement, in violation of the Confrontation and Compulsory Process Clauses of the Sixth Amendment. Lettsome also complains that the Appellate Division erred in its application of the harmless error rule. We disagree with Lettsome on both points.

First, the Supreme Court decided thirty years ago that Compulsory Process Clause and Confrontation Clause errors are subject to harmless error review. *See Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (holding that Compulsory Process Clause violations are subject to harmless error review); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause errors are subject to harmless error review). Although Lettsome argues that *Van Arsdall* has been undermined by *Crawford v. Washington*, 541 U.S. 36 (2004), our Court, as well as every other Court of Appeals, has continued to apply harmless error analysis to Confrontation Clause claims. *See, e.g.*, *Holland v.*

*Rivard*, 800 F.3d 224, 243 (6th Cir. 2015); *United States v. Carter*, 776 F.3d 1309, 1328 (11th Cir. 2015); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1147 (10th Cir. 2014); *United States v. Jimenez*, 513 F.3d 62, 78 (3d Cir. 2008). Indeed, Lettsome has not cited a single case holding that a Confrontation Clause error is not subject to harmless error review. We, of course, remain bound by extant Supreme Court precedent directly on point, even if its reasoning has been called into question by other Supreme Court decisions. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *United States v. Henderson*, 841 F.3d 623, 626 n.3 (3d Cir. 2016). *Van Arsdall* is directly on point and thus controlling. Accordingly, the Appellate Division did not err in concluding that any Confrontation or Compulsory Process Clause error was subject to harmless error review.

Lettsome contends that even if harmless error review was appropriate, the Appellate Division's harmless error analysis was insufficiently rigorous. Again, we disagree. Although the Appellate Division did not articulate the precise harmless error test it was applying, it did consider, as required, the totality of the record. A Confrontation Clause or a Compulsory Clause violation requires an assessment of whether the erroneous admission of Taylor's statements was "harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. As the Appellate Division accurately recounted, "Lettsome was placed at Geiger's house by abundant forensic evidence, and

8

Lettsome confessed in detail to the crimes." (App. 36.) Taylor's second statement to the police merely corroborated what Lettsome had told the police. Furthermore, Lettsome was able to read a statement of what he anticipated Taylor would have told the jury if she were present to testify, and that statement recanted her November 11th report to the police about Lettsome's participation in the murder.[5] Given the evidence against him, including his confessions and the presence of his blood and DNA at the crime scene, we find, beyond a reasonable doubt, that any Sixth Amendment violation would not have contributed to Lettsome's conviction. *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). Thus, any Sixth Amendment violation was harmless.

Second, Lettsome argues that the Appellate Division erred by affirming the trial court's decision to allow the Information to be amended to correct pleading defects in the use of a dangerous weapon charges. We agree, however, with the Appellate Division that Lettsome cannot claim he was unfairly surprised by the amendment because the charges indeed "cited most of the elements and referenced the appropriate statutory provision." (App. 44.) Because the amended information did not charge an "additional or different" offense, and because Lettsome was not unfairly surprised, Lettsome's substantial rights

---

[5] The Government contends that the "invited error" doctrine precludes Lettsome from challenging the admission of Taylor's statements. Asserting that "Lettsome unquestionably invited the admission of Amber Taylor's statement when defense counsel helped craft the [narrative] and read it into the record," the Government argues that the admission of her statements to the police cannot be the basis for reversal of the verdict. (Appellee's Br. at 20.) In view of our disposition of this issue, we need not reach the question of the applicability of the "invited error" doctrine.

were not prejudiced. *See Gov't of the Virgin Islands v. Bedford*, 671 F.2d 758, 765-66 (3d Cir. 1982).

Third, Lettsome argues that the Superior Court abused its discretion by denying Lettsome's pretrial motion to continue. The denial of a motion to continue "constitutes an abuse of discretion only when it is so arbitrary as to violate due process." *United States v. Kikumura*, 947 F.2d 72, 78 (3d Cir. 1991) (internal quotation omitted); *Gov't of Virgin Islands v. Charleswell*, 115 F.3d 171, 174 (3d Cir. 1997) ("[T]rial judges must balance the conflicting demands of court administration with the rights of the accused as well as those of co-defendants and others awaiting trial who would be affected by the consequences of a delay."). Here, Lettsome knew as early as March 2006 that the Government was awaiting results of a DNA analysis, and he also knew that the results were expected by late July before his trial in August. Lettsome had ample time to move for his own DNA expert. When Lettsome received the DNA analysis two weeks before trial, he waited a week before filing his motion for a continuance. Under these circumstances, we cannot conclude that the Superior Court abused its discretion by denying Lettsome's motion for a continuance.

Fourth, Lettsome argues that there was insufficient evidence to sustain his conviction for first degree arson under Virgin Islands law for two reasons. First, he argues that, at the time of the attack on the Geigers, USVI law defined first degree arson as "*maliciously* burn[ing] in the *night time* an inhabited building in which there is at the

10

time some human being." V.I. Code Ann., tit. 14, § 252(a) (2005) (emphasis added).[6]

Lettsome argues that, because the fire was not set until after midnight, *i.e.* in the "a.m.,"

he cannot be convicted of first degree arson. We believe, however, that the statute's use

of the term "night time" is to be accorded its natural and commonsense meaning, *i.e.*

while it is dark outside. *See United States v. Diallo*, 575 F.3d 252, 256 (3d Cir. 2009)

("The role of the courts in interpreting a statute is to give effect to Congress's intent. . . .

Because it is presumed that Congress expresses its intent through the ordinary meaning of

its language, every exercise of statutory interpretation begins with an examination of the

plain language of the statute.") (citation omitted); *see also Nighttime*, *Webster's Third*

*New International Dictionary of the English Language Unabridged* (1993) ("the time

---

[6] The definition of arson in the first degree was changed substantially in 2013. One of the changes was to eliminate the requirement that the fire be set in the "night time." Section 252(a) of V.I. Code Ann., tit. 14 now defines arson in the first degree as follows:

> (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, or while in the commission of any felony, he starts a fire or causes an explosion, and:
> (1) the building is inhabited or occupied, or the person has a reason to believe the building may be inhabited or occupied; or
> (2) it is a structure where persons are normally present, such as: jails, prisons or detention centers; hospitals, nursing homes or other health care facilities; department stores, office buildings, business establishments, churches or educational institutions during normal hours of occupancy; or other similar structures; or
> (3) any other person sustains serious physical injury as a result of the fire or explosion or the firefighting as a result thereof.

from dusk to dawn"). We have not found any persuasive support for the argument that "night time" necessarily means before midnight. The evidence indisputably shows that the fire was set between dusk and dawn, triggering application of the first degree arson statute.

Lettsome also argues that he lacked the required element of "maliciousness" because he honked his car horn to warn other tenants of the fire. Nonetheless, because Lettsome confessed to starting the fire to remove evidence of his crimes, we agree that there was sufficient evidence of maliciousness to convict Lettsome of first degree arson.

Fifth and finally, Lettsome argues that the Appellate Division erred in finding that his sentence of more than 57 years in prison, plus fines exceeding $35,000, violate the Eighth Amendment proscription against cruel and unusual punishment. "Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." *United States v. Miknevich*, 638 F.3d 178, 186 (3d Cir. 2011). Here, Lettsome's sentence is within the statutory maximums. Moreover, in light of the seriousness of Lettsome's crimes, we agree with the Appellate Division that Lettsome's sentence is not excessive. Therefore, we cannot find that his sentence violates the Eighth Amendment.

III.

For the foregoing reasons, we will affirm the Appellate Division's order of August 21, 2015.

12